[No. F004260. Fifth Dist. Dec. 30, 1985.]

In re STEPHAN M. BARNES on Habeas Corpus.

COUNSEL

Deborah A. Vollmer, under appointment by the Court of Appeal, for Petitioner.

John K. Van de Kamp, Attorney General, Nancy Sweet, Arnold O. Overoye, Ramon de la Guardia and Cathy Neff, Deputy Attorneys General, for Respondent.

OPINION

**WOOLPERT, J.**—On April 26, 1984, petitioner, in pro. per., filed a petition for a writ of habeas corpus in the Kern County Superior Court to challenge on equal protection grounds the unavailability of Penal Code section 2933[1] credits to him while he was incarcerated in the restrictive housing unit of the California Correctional Institution at Tehachapi (Tehachapi). The superior court denied the petition on May 30, 1984, with a brief statement of reasons.

Petitioner then filed a similar petition in this court raising the identical challenge. We posed questions and directed respondent, the Superintendent of Tehachapi, to file preliminary opposition addressing the issues raised by our questions. Likewise, we granted petitioner leave to reply to respondent's opposition.

After receiving briefs, this court appointed a special referee to hear the matter and make written findings of fact upon issues raised by this court. In addition, we appointed counsel for petitioner.

---

[1]All statutory references are to the Penal Code unless otherwise indicated.

Following the referee's extended hearing and comprehensive findings, this court ordered the parties to brief issues raised by the findings. The parties have respectively filed several briefs. On May 20, 1985, respondent filed a return to the petition.

### THE FACTS

In 1982 the Legislature enacted section 2933[2] creating one-for-one worktime credits for state prisoners' full participation in work, training or edu-

---

[2]Section 2933: "(a) It is the intent of the Legislature that persons convicted of crime and sentenced to state prison, under Section 1170, serve the entire sentence imposed by the court, except for a reduction in the time served in the custody of the Director of Corrections for performance in work, training or education programs established by the Director of Corrections. Worktime credits shall apply for performance in work assignments and performance in elementary, high school, or vocational education programs. Enrollment in a two- or four-year college program leading to a degree shall result in the application of time credits equal to that provided in Section 2931. For every six months of full-time performance in a credit qualifying program, as designated by the director, a prisoner shall be awarded worktime credit reductions from his term of confinement of six months. A lesser amount of credit based on this ratio shall be awarded for any lesser period of continuous performance. Less than maximum credit should be awarded pursuant to regulations adopted by the director for prisoners not assigned to a full-time credit qualifying program. Every prisoner who refuses to accept a full-time credit qualifying assignment or who is denied the opportunity to earn worktime credits pursuant to subdivision (a) of Section 2932 shall be awarded no worktime credit reduction. Every prisoner who voluntarily accepts a half-time credit qualifying assignment in lieu of a full-time assignment shall be awarded worktime credit reductions from his term of confinement of three months for each six-month period of continued performance. Except as provided in subdivision (a) of Section 2932, every prisoner willing to participate in a full-time credit qualifying assignment but who is either not assigned to a full-time assignment or is assigned to a program for less than full time, shall receive no less credit than is provided under Section 2931. Under no circumstances shall any prisoner receive more than six months' credit reduction for any six-month period under this section.

"(b) Worktime credit is a privilege, not a right. Worktime credit must be earned and may be forfeited pursuant to the provisions of Section 2932. Except as provided in subdivision (a) of Section 2932, every prisoner shall have a reasonable opportunity to participate in a full-time credit qualifying assignment in a manner consistent with institutional security and available resources.

"(c) Under regulations adopted by the Department of Corrections, which shall require a period of not more than one year free of disciplinary infractions, worktime credit which has been previously forfeited may be restored by the director. The regulations shall provide for separate classifications of serious disciplinary infractions as they relate to restoration of credits; the time period required before forfeited credits or a portion thereof may be restored; and the percentage of forfeited credits that may be restored for such time periods. No credits may be restored if they were forfeited for a serious disciplinary infraction in which the victim died or was permanently disabled. Upon application of the prisoner and following completion of the required time period free of disciplinary offenses, forfeited credits eligible for restoration under the regulations shall be restored unless, at a hearing, it is found that the prisoner refused to accept or failed to perform in a credit qualifying assignment or extraordinary circumstances are present that require that credits not be restored. 'Extraordinary circumstances' shall be defined in the regulations adopted by the director.

"The prisoner may appeal the finding through the Department of Corrections review procedure, which shall include a review by an individual independent of the institution who

cation programs established by the Director of Corrections. In relevant part section 2933 provides: "[E]very prisoner shall have a reasonable opportunity to participate in a full-time credit qualifying assignment in a manner consistent with institutional security and available resources."

In response to section 2933, the Department of Corrections (CDC) determined that given existing resources and staff, it could not offer the program to all of the state's prison inmates. Therefore CDC adopted priorities based, in part, upon the prisoners' housing status.

The *first priority* was to provide work and educational opportunities to the general population inmates. These prisoners have general access throughout the institution or camp to which they are assigned, e.g., the recreation yards, visiting rooms, canteen lines, etc. General population inmates are distinguished from those inmates who are housed in special housing units. Special housing units include protective housing units, management control units, and security housing units.

CDC's *second priority* was to provide similar opportunities to protective housing unit inmates. In 1984 CDC had two protective housing units located at the Correctional Training Facility, Soledad (Soledad).[3] Protective housing units provide secure housing and protection from the general population for inmates whose housing in a general population setting would endanger their own safety. More specifically, inmates are assigned to protective housing units for the following reasons: (1) life threatened inmates (those inmates who for specified reasons fear for their lives); (2) inmates who for some unspecified reason believe their lives to be threatened; (3) inmates who have cooperated with law enforcement or with CDC investigations; (4) inmates of great notoriety or inmates who held a particular precustody occupation such as police officer; (5) active prison gang members; (6) former prison gang members whose lives are in danger; (7) inmates who have testified for law enforcement, either against crime partners or about gang members and activities; and (8) inmates who have been convicted of particular crimes, such as child molestation.

The *third priority* was to provide jobs for management control unit inmates located at San Quentin. A management control unit is an intermediate

has supervisorial authority over the institution.

"(d) The provisions of subdivision (c) shall also apply in cases of credit forfeited under Section 2931 for offenses and serious disciplinary infractions occurring on or after January 1, 1983."

[3]Throughout the opinion we refer to conditions at the time of the referee's hearing in 1984. Obviously, an increase in prison population, delays in planned expansion of facilities, and experimentation in adopting section 2933 programs, may have altered the described conditions.

housing level between general population housing and security housing. The inmates in these units are in transition between their release from a security housing unit and return to general population.

The *last priority* was to provide jobs for security housing unit inmates, including those prisoners in maximum security. CDC has six such units, two located at Folsom and four located at San Quentin. These units include condemned inmates.

CDC did not prioritize the restrictive housing unit in which petitioner is an inmate. Indeed, CDC does not have section 2933 credit qualifying programs available for such inmates. The restrictive housing unit is a hybrid of Soledad's protective housing units. Upon the recommendation of CDC's Special Services Unit and an inmate's request, a protective housing unit inmate may transfer for security reasons from Soledad to the more restrictive unit at Tehachapi. Generally these inmates are prison gang dropouts and/or informants. The unit at Tehachapi consists of 12 one-person cells occupied by inmates who are the subjects of suspected death contracts. Security is such that the corridor immediately adjacent to the cells is divided into four parts by chain link fences or bars. Additionally, only two and sometimes three inmates by mutual request may exercise together. The 12 cells are located in the segregation lockup unit at Tehachapi, isolated by a fence and separate access gate from the remainder of the institution.

Petitioner was sentenced to state prison in 1981 following his conviction for robbery (§ 211), false imprisonment (§ 236) and assault with a deadly weapon (§ 245, subd. (a)). While in prison, petitioner testified for the prosecution in three prison crime cases and in the "Hillside Strangler" case. Shortly before petitioner testified in the "Hillside Strangler" case his father was murdered, purportedly at the direction of the Aryan Brotherhood. Petitioner was a former member of that prison gang. As a result, CDC transferred petitioner to protective housing confinement at Soledad. In October 1983, petitioner transferred to Tehachapi.

While at Tehachapi, petitioner engaged in cell-study. He claims to have studied high school subjects an average of six hours a day. Each Friday a credentialed teacher with Tehachapi's work-incentive program visited petitioner for 15 to 20 minutes. During these visits, the teacher administered tests on the materials petitioner studied during the previous week. The teacher picked up petitioner's tests after visiting other cell-study inmates in the unit. Petitioner earned 130 units towards his high school diploma; the required number for such a diploma is 175 units. CDC, however, did not approve cell-study for section 2933 credits. Thus, petitioner was denied section 2933 credits for his efforts during his incarceration prior to parole.

By comparison, CDC maintains section 2933 credit-qualifying high school and elementary educational programs for protective housing unit inmates at Soledad. These inmates are divided into two groups, one consisting of 140 men, the other 130. The men in the larger group are allowed to mingle during mealtime and exercise periods and while watching television. The smaller group's interaction is more restricted. These men, for example, eat meals in their cells, and watch television and exercise only in small groups. They are described as having enemies even within the units.

Soledad's protective housing inmates study in two small classrooms, one for each unit. The usual class size is 25 students with 1 instructor. In the elementary and high school program, there are two full-time instructors credentialed by the State of California. Students are required to be in the classroom six hours a day, five days a week. Each instructor is responsible for keeping attendance records (time cards). Three inmates who have previously graduated from the program assist each instructor and class. These assistants give the students individualized assistance and instruction.

The routine method of instruction consists of individually assigned study-work projects which each inmate pursues on his own during class. An inmate receives individual instruction and assistance as needed. Each student progresses through the program at his own speed. The inmate may remain in the program until graduation so long as he has full attendance, is not disruptive, and shows interest. Specific grade achievement is not a measure of performance, but may be considered as reflective of interest.

Petitioner contends that inmates in his restrictive housing unit who engage in cell-study should be entitled as a matter of equal protection of the laws to the same one-for-one credits against their sentences as are earned by Soledad's protective housing inmates who engage in classroom study.

## DISCUSSION

■ Following the filing of the petition, certain events have taken place which cause us to conclude that as to petitioner the matter is moot. First, petitioner was placed on parole after an extraordinary grant of time credits and resentencing. We need not discuss why and how the credited time was given. The record does not enable us to determine whether the authorities arranged petitioner's release date to coincide with the parole date he would have received had one-for-one credits been awarded. Petitioner presents no facts to show his parole took place in an unacceptable manner or time frame.

After his release, petitioner violated the terms of his parole. His parole has been revoked and once again he is in the same restrictive housing unit at Tehachapi. However, he serves time under different rules.

In the usual situation a section 1170 inmate enters prison with a fixed term. Such an inmate may obtain an earlier release date depending upon the credits he or she earns. Sections 2930-2935 set forth the manner in which the credits may be accumulated and lost. In this case petitioner received special credits, resulting in an early parole release.

Now, petitioner has been returned to prison with the new status of a parole violator. It is true that for some purposes he always remained lawfully "in custody," even while on parole. (*In re Caudillo* (1980) 26 Cal.3d 623, 636 [164 Cal.Rptr. 692, 610 P.2d 1021]; § 3056.) Nevertheless, his reimprisonment as a parole violator subjects him to different time consequences. (*In re Philpott* (1985) 163 Cal.App.3d 1152 [210 Cal.Rptr. 95].) The term of his further imprisonment depends on sections 3000[4] (length and condi-

---

[4]Section 3000: "The Legislature finds and declares that the period immediately following incarceration is critical to successful reintegration of the offender into society and to positive citizenship. It is in the interest of public safety for the state to provide for the supervision of and surveillance of parolees and to provide educational, vocational, family and personal counseling necessary to assist parolees in the transition between imprisonment and discharge. A sentence pursuant to Section 1168 or 1170 shall include a period of parole, unless waived, as provided in this section. Notwithstanding any provision to the contrary in Article 3 (commencing with Section 3040) of this chapter:

"(a) At the expiration of a term of imprisonment of one year and one day, or a term of imprisonment imposed pursuant to Section 1170, or at the expiration of such term as reduced pursuant to Section 2931, if applicable, the inmate shall be released on parole for a period not exceeding three years, unless the board for good cause waives parole and discharges the inmate from custody of the department.

"(b) In the case of any inmate sentenced under Section 1168, the period of parole shall not exceed five years in the case of an inmate imprisoned for any offense other than first or second degree murder for which the inmate has received a life sentence, and shall not exceed three years in the case of any other inmate, unless in either case the board for good cause waives parole and discharges the inmate from custody of the department. This subdivision shall be also applicable to inmates who committed crimes prior to July 1, 1977, to the extent specified in Section 1170.2.

"(c) The board shall consider the request of any inmate regarding the length of his parole and the conditions thereof.

"(d) Upon successful completion of parole, or at the end of the maximum statutory period of parole specified for the inmate under subdivision (a) or (b), as the case may be, whichever is earlier, the inmate shall be discharged from custody. The date of the maximum statutory period of parole under this subdivision and subdivisions (a) and (b) shall be computed from the date of initial parole, or July 1, 1977, whichever is later, and shall be a period chronologically determined. Time during which parole is suspended because the prisoner has absconded or has been returned to custody as a parole violator shall not be credited toward such period of parole unless the prisoner is found not guilty of the parole violation. However, in no case, except as provided in Section 3064, may a prisoner subject to three years on parole be retained under parole supervision or in custody for a period longer than four years from the date of his initial parole, and except as provided in Section 3064, in no case may a prisoner subject to five years on parole be retained under parole supervision or in custody for a period longer than seven years from the date of his initial parole.

"(e) It is not the intent of this section to diminish resources presently allocated to the Department of Corrections for parole functions.

"(f) The Department of Corrections shall meet with each inmate at least 30 days prior to his good time release date, unless such release date is within 30 days of July 1, 1977, and

tions of parole) and 3057[5] (period of confinement after revocation of parole). Presumably the Board of Prison Terms reviewed petitioner's parole violations and, within the section 3057 guidelines and limitations, set a new parole date. The new parole date is not subject to section 2931 or 2933 credits.

Ordinarily, section 1170 inmates earn time credits during good behavior; section 2931 and 2933 credits are subject to loss under the elaborate provisions of section 2932. In this way peaceful confinement is to be encouraged in a work-education atmosphere. In contrast, for the inmate who has been returned as a parole violator, section 3057 contains its own motivation for good behavior. Subdivision (c) allows the board to *extend* a parole violator's confinement up to 12 months because of in-prison misconduct. The extension commences on the expiration of the new parole date set by the board after the parole violation. Except when extended by such board action, the parole date will not change.

Therefore, petitioner's new release on parole will depend upon his conduct in prison, not on section 2933 credits. Under these circumstances he is entitled to no relief; the issue presented by the petition is moot.

Although the petitioner's change of status renders his petition moot, the proceedings before our special referee reveal a need for CDC to review the relationship of restrictive housing at Tehachapi to the possible accumulation of section 2933 credits. In particular, certain impressions may be gained from the evidence before the referee. We will outline several problems

---

shall provide, under guidelines specified by the Board of Prison Terms, the conditions of parole and the length of parole up to the maximum period of time provided by law. The inmate has the right to reconsideration of the length of parole and conditions thereof by the Board of Prison Terms."

[5]Section 3057: "(a) Confinement pursuant to a revocation of parole in the absence of a new conviction and commitment to prison under other provisions of law, shall not exceed 12 months, except as provided in subdivision (c).

"(b) Upon completion of confinement pursuant to parole revocation without a new commitment to prison, the inmate shall be released on parole for a period which shall not extend beyond that portion of the maximum statutory period of parole specified by Section 3000 which was unexpired at the time of each revocation.

"(c) Notwithstanding the limitations in subdivision (a) and in section 3060.5 upon confinement pursuant to a parole revocation, the board may extend the confinement pursuant to parole revocation for a maximum of an additional 12 months for subsequent acts of misconduct committed by the parolee while confined pursuant to that parole revocation. Upon a finding of good cause to believe that a parolee has committed a subsequent act of misconduct and utilizing procedures governing parole revocation proceedings, the board may extend the period of confinement pursuant to parole revocation as follows: (1) not more than 180 days for an act punishable as a felony whether or not prosecution is undertaken, 2) not more than 90 days for an act punishable as a misdemeanor, whether or not prosecution is undertaken, and (3) not more than 30 days for an act defined as a serious disciplinary offense pursuant to subdivision (a) of Section 2932."

which, but for petitioner's release on parole and return as a violator, would cause this court concern.

CDC denied petitioner section 2933 credits because there was an "administrative rule" which mandated a classroom setting, consequently prohibiting such credits for cell-study. Cell-study alone, no matter how successful when measured by tests, graduation, or other means to screen out nonachievers, would only merit one-for-two credit. When a copy of the rule was requested by the referee, and later by this court, no such written rule could be found. Although the restrictive housing unit inmates may be few in number, denial of credits to any inmate should be based upon a firmer administrative position.

The referee heard considerable evidence concerning the costs of providing means to these inmates to study under qualifying conditions. Petitioner offered some evidence on the question whether cell-study supervision would be economically feasible and without security risks. CDC's reason for denying credits for cell-study appeared to be so intertwined with the fact a "rule" existed prohibiting it that we are convinced a fresh start in reviewing feasibility and costs may result in a different administrative decision.

The economic feasibility evidence stressed the cost of providing supervised classroom space and the additional time and effort involved on the part of teachers and guards. That testimony was not particularly convincing. Moreover, it is notable that CDC did not consider what portion of the cost of implementing a qualifying program would be offset by the reduced cost of housing such inmates for shorter time periods if one-for-one credits were available. Surely one of the policy reasons for the enactment of section 2933 was the view that needed prison cell space would become available with the implementation of the section.

Finally, the evidence indicated that petitioner's restrictive housing status was caused at least in part by his cooperation with law enforcement in the Hillside Strangler case. His cooperation may have caused his father's death. CDC protects inmates in the restrictive housing unit for a variety of reasons, including activities countenanced or desired by prison authorities. Therefore, we are struck by the apparent inconsistency of encouraging or permitting the inmate to become "at personal risk" and then housing the inmate so that he may not earn section 2933 credits. We have some doubt that the extraordinary methods employed in this case to give petitioner early parole will moot every petition challenging the claimed disparity of treatment.

The writ is denied.

Brown (G. A.), P. J., and Martin, J., concurred.

A petition for a rehearing was denied January 27, 1986, and petitioner's application for review by the Supreme Court was denied April 3, 1986. Reynoso, J., and Grodin, J., were of the opinion that the application should be granted.