Joseph **TOUSSAINT**, et al.,
**Plaintiffs/Appellees/Cross-Appellants,**

v.

Daniel **McCARTHY**, et al.,
**Defendants/Appellants/Cross-Appellees.**

Nos. 84-2833, 85-1507, 85-1878
and 85-2526.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 13, 1985.

Decided Sept. 30, 1986.

---

Anita Arriola, Sidney M. Wolinsky, Constance M. Jones, Sarah Flanagan, Mark A. Chavez, Bernard Zimmerman, Pillsbury, Madison & Sutro, San Francisco, Cal., Donald Spector, San Quentin, Cal., Antonia Hernandez, Mexican-American Legal Defense & Educ. Fund, James C. Sturdevant, Sturdevant & Elion, San Francisco, Cal., Ellen Sue Goldblatt, Oakland, Cal., Julius

Chambers, Deborah Fins, New York City, Barbara Y. Phillips, Mark S. Zemelman, Sanford Jay Rosen, San Francisco, Cal., for Toussaint.

Paul D. Gifford, Deputy Atty. Gen., San Francisco, Cal., for McCarthy.

Before WRIGHT, KENNEDY and BEEZER, Circuit Judges.

BEEZER, Circuit Judge:

Both parties appeal from the district court's order granting permanent injunctive relief against California prison officials. Although this appeal presents a variety of discrete issues, the case presents this general issue: Does the protection afforded by the United States Constitution require that San Quentin and Folsom prison officials remain subject to controls imposed by the district court or should prison control be returned to California prison officials? We conclude that, in general, the district court assumed too much control over the day to day affairs of the prisons. Therefore, constitutional restraints require modification of the district court's decree.

# I

## BACKGROUND

This class action was commenced on behalf of prisoners committed to administrative segregation in four California prisons: San Quentin, Folsom, Deuel Vocational Institute at Tracy, and the Correctional Training Facility at Soledad. The defendants are the Director of the California Department of Corrections and the wardens of the prisons involved. We address orders pertaining to San Quentin and Folsom.

The complaint was filed in 1973. In the first phase of the proceedings, a three-judge district court held that the state's practice of removing prisoners from the general population and placing them in maximum security segregation units violated the prisoners' fourteenth amendment right to due process of law. See Wright v. Enomoto, 462 F.Supp. 397 (N.D.Cal.1976) (hereinafter referred to as "Wright I"). In Wright I, the defendants were ordered to employ a variety of procedures before segregating prisoners for administrative reasons. See id. at 404–05. The Supreme Court summarily affirmed the district court. Enomoto v. Wright, 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978).

In the next phase of the litigation, the district court issued an unpublished comprehensive preliminary injunction governing the conditions of confinement in the segregation units of the four prisons. We reversed the district court and vacated the injunction on the grounds that the district court applied the incorrect legal standard in assessing the plaintiffs' eighth amendment claims. See Wright v. Rushen, 642 F.2d 1129 (9th Cir.1981).

On remand, the district reevaluated the conditions of confinement under the standard prescribed by Wright v. Rushen and issued a detailed preliminary injunction governing conditions of confinement and procedures for placement and retention in administrative segregation. See Toussaint v. Rushen, 553 F.Supp. 1365 (N.D.Cal. 1983). Although we affirmed the district court for the most part, we vacated a portion of the order which was not supported by the record. Toussaint v. Yockey, 722 F.2d 1490 (9th Cir.1984). We also directed the district court to reconsider its conclusions regarding the continuing propriety of procedural requirements in light of the Supreme Court's decision in Hewitt v. Helms, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). See Toussaint v. Yockey, 722 F.2d at 1494 n. 6.

In the present phase of this case, the district court entered an injunction, which we refer to as the Permanent Injunction, governing conditions of confinement and segregation procedures at San Quentin and Folsom. Toussaint v. McCarthy, 597 F.Supp. 1388 (N.D.Cal.1984). The court appointed a special master, known as the Monitor, to assist in the implementation of

the Permanent Injunction and to advise the court regarding the need for further modifications of the Injunction. *Id.* at 1420–22. Pursuant to the order of reference, the Monitor ordered the release of a number of prisoners from administrative segregation.

Defendants now challenge various aspects of the Permanent Injunction and the district court's affirmance of the Monitor's order to release a number of prisoners from administrative segregation. Defendants urge us to vacate parts III, IV(B), (C), and (D), and to modify Parts II(6), (10), and (15) of the Permanent Injunction. Defendants also complain about the district court's affirmance of the Monitor's decision to release prisoners Altamirano, Mendoza, Ramos, Castro, Gallegos, Hayes, Ferrel, Shryock, Pina, Elmore and Barela.

Plaintiffs cross-appeal the district court's refusal to extend the sweep of the injunction to cover additional prison conditions. Plaintiffs urge us to hold that enforced idleness in administrative segregation constitutes cruel and unusual punishment, that inmates legitimately barred from the prison law library be provided with adequate legal assistance, that health care services provided at Folsom do not meet minimum constitutional standards, and that denial of contact visitation constitutes cruel and unusual punishment.

The opinions cited above offer additional discussion of the facts. We will discuss specific facts and arguments in turn.

## II

### SCOPE OF FEDERAL INJUNCTIVE RELIEF

In *Ruiz v. Estelle,* 679 F.2d 1115 (5th Cir.1982), *amended,* 688 F.2d 266 (5th Cir. 1982), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983), the Fifth Circuit reviewed a district court's order of injunctive relief against state prison officials. The Fifth Circuit described the role of the federal courts as follows:

There is no iron curtain drawn between the Constitution and the prisons of this country. When the remedial powers of a federal court are invoked to protect the constitutional rights of inmates, the court may not take a hands-off approach.

The duty to protect inmates' constitutional rights, however, does not confer the power to manage prisons, for which courts are ill-equipped, or the capacity to second-guess prison administrators. Federal courts should not, in the name of the Constitution, become enmeshed in the minutiae of prison operations. Our task is limited to enforcing constitutional standards and does not embrace superintending prison administration.

679 F.2d at 1126 (notes and quotations omitted). The court also stated that

As a matter of respect for the state's role and for the allocation of functions in our federal system, as well as comity toward the state, the relief ordered by federal courts must be consistent with the policy of minimum intrusion into the affairs of state prison administration that the Supreme Court has articulated for the federal courts. "[T]he principles of federalism which play such an important part in governing the relationship between federal courts and state governments" are applicable "where injunctive relief is sought ... against those in charge of an executive branch of an agency of state" government. [*Rizzo v. Goode,* 423 U.S. 362, 380, 96 S.Ct. 598, 608, 46 L.Ed.2d 561 (1976).] We should, therefore, fashion the least intrusive remedy that will still be effective. In shaping that remedy, we must also, as a matter of judicial administration, regard the essential nature of federal courts in an adversary system. Our remedial powers are inherently judicial, not administrative.

679 F.2d at 1145 (notes and quotations omitted).

 We agree with the Fifth Circuit's description of the role of the federal courts. Injunctive relief against a state agency or official must be no broader than necessary to remedy the constitutional violation. *See Milliken v. Bradley,* 433 U.S. 267, 280, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977)

(remedy must be related to condition alleged to offend the constitution); *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971) (task is to correct, by a balancing of the interests, the condition that offends the constitution; judicial powers may be exercised only on the basis of a constitutional violation); *Hoptowit v. Spellman*, 753 F.2d 779, 785 (9th Cir.1985) (judge must order correction of specific violations and may require only that these corrections bring the conditions above constitutional minima); *Newman v. Alabama*, 683 F.2d 1312, 1319 (5th Cir.1982) (relief must be no broader than necessary to remedy the constitutional violation), *cert. denied*, 460 U.S. 1083, 103 S.Ct. 1773, 76 L.Ed.2d 346 (1983); *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir.1982) (function of court is limited to determining whether a constitutional violation has occurred and to fashioning a remedy that does no more and no less than correct that particular constitutional violation); *Ruiz v. Estelle*, 679 F.2d at 1144–46 (court must fashion the least intrusive remedy that will still be effective). A federal court may not enjoin a state official to follow state law. *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 97–121, 104 S.Ct. 900, 906–19, 79 L.Ed.2d 67 (1984). "The federal courts do not sit to supervise state prisons, the administration of which is of acute interest to the States." *Meachum v. Fano*, 427 U.S. 215, 229, 96 S.Ct. 2532, 2540, 49 L.Ed.2d 451 (1976).

■ In fashioning a remedy for constitutional violations, a federal court must order effective relief. *Smith v. Sullivan*, 611 F.2d 1039, 1044 (5th Cir.1980). Therefore, a federal court may order relief that the Constitution would not of its own force initially require if such relief is necessary to remedy a constitutional violation. *See North Carolina State Board of Education v. Swann*, 402 U.S. 43, 46, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586 (1971); *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. at 15–16, 91 S.Ct. at 1276. A defendant's history of noncompliance with prior court orders is a relevant factor in determining the necessary scope of an effective remedy. *Hutto v. Finney*, 437 U.S. 678, 687, 98 S.Ct. 2565, 2571, 57 L.Ed.2d 522 (1978); *Hoptowit v. Ray*, 682 F.2d at 1247; *Ruiz v. Estelle*, 679 F.2d at 1155–56.

However, our goal is to cure only constitutional violations. *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. at 16, 91 S.Ct. at 1276; *Wright v. Rushen*, 642 F.2d 1129, 1133–34 (9th Cir. 1981). The commission of a federal judge is not a "general assignment to go about doing good." *Jett v. Castaneda*, 578 F.2d 842, 845 (9th Cir.1978). Accordingly, injunctive restraints that exceed constitutional minima must be narrowly tailored to prevent repetition of proved constitutional violations, and must not intrude unnecessarily on state functions. *Ruiz v. Estelle*, 679 F.2d at 1156. *See generally* Mishkin, *Federal Courts as State Reformers*, 35 Wash. & Lee L.Rev. 949 (1978).

## III

### SCOPE OF APPELLATE REVIEW

■ We are guided by three standards of review. We defer to the district court's findings of fact unless they are clearly erroneous. *Anderson v. City of Bessemer*, 470 U.S. 564, 105 S.Ct. 1504, 1510–11, 84 L.Ed.2d 518 (1985); Fed.R.Civ.P. 52(a). We review the district court's legal conclusions de novo. *In re McLinn*, 739 F.2d 1395, 1398 (9th Cir.1984) (en banc); *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). We review the scope of injunctive relief for an abuse of discretion. *Hutto v. Finney*, 437 U.S. at 687–88, 98 S.Ct. at 2572; *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. at 15, 91 S.Ct. at 1275–76; *Hoptowit v. Ray*, 682 F.2d at 1245–46.

The term, "abuse of discretion," is often misunderstood and, perhaps, is an unfortunate label. *See Pearson v. Dennison*, 353 F.2d 24, 28 n. 6 (9th Cir.1965); R. Aldisert,

*The Judicial Process* 759 (1976). Yet, the legacy of hundreds of cases renders "abuse of discretion" a term of art. *See* Friendly, *Indiscretion About Discretion*, 31 Emory L.J. 747, 762–63 (1982). We must recognize, however, that the term is a "verbal coat of many colors." *Id.* at 763 (quoting *United States v. L.A. Tucker Truck Lines*, 344 U.S. 33, 39, 73 S.Ct. 67, 70, 97 L.Ed. 54 (1952) (Frankfurter, J., dissenting)). Judge Friendly notes that

> [t]here are half a dozen different definitions of "abuse of discretion," ranging from ones that would require the appellate court to come close to finding that the trial court had taken leave of its senses to others which differ from the definition of error by only the slightest nuance, with numerous variations between the extremes.

Friendly, *supra*, at 763.[1] The Third Circuit has reasoned that

> [i]n our judicial system, a wide variety of decisions covering a broad range of subject matters, both procedural and substantive, is left to the discretion of the trial court. The justifications for committing decisions to the discretion of the court are not uniform, and may vary with the specific type of decisions. Although the standard of review in such instances is generally framed as "abuse of discretion," in fact the scope of review will be directly related to the reason why

that category or type of decision is committed to the trial court's discretion in the first instance.

*United States v. Criden*, 648 F.2d 814, 817 (3d Cir.1981) (footnote omitted). We agree with *Criden*. The extent of our deference to the district court is determined by several competing factors.

The remedy prescribed by the district court is something more than a mere permanent injunction. We address a "structural injunction"[2] in which a United States district court has enjoined state administrative officials in order to force a state agency to comply with constitutional standards. Such an injunction presents several relevant considerations, some of which militate towards great deference, and others which demand close and exacting scrutiny.

In protracted, complex litigation, the district court will acquire a close familiarity with the facts, parties, and nuances of the case, especially, as is the situation here, when the same judge has presided throughout. *See* Hinkle, *Appellate Supervision of Remedies in Public Law Adjudication*, 4 Fla.St.U.L.Rev. 411, 440 (1976).[3] The ability to hear witnesses and directly view prison conditions places the district court judge in a superior position to consider alternative forms of relief. A district court's ability to fashion the most effective remedy

---

1. We have recognized implicitly that the abuse of discretion standard varies with the decision being reviewed. *See, e.g., C–Y Development Co. v. City of Redlands*, 703 F.2d 375, 377 (9th Cir. 1983); *see also LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 74–75 (2d Cir.1985) (the term, "abuse of discretion," is capable of widely varying interpretations); *Roland Machinery Co. v. Dresser Industries*, 749 F.2d 380, 390 (7th Cir. 1984) ("abuse of discretion" describes a range of standards); *Osuchukwu v. INS*, 744 F.2d 1136, 1142 (5th Cir.1984) ("abuse of discretion" is variable standard).

2. The term, "structural injunction," refers to the course of litigation and the series of orders that seek to "effectuate the reorganization of an ongoing social institution." O. Fiss, The Civil Rights Injunction 7 (1978). This form of injunctive relief is also known as an "institutional decree," an "administrative injunction," *see* Fletcher, *The Discretionary Constitution: Institu-*

*tional Remedies and Judicial Legitimacy*, 91 Yale L.J. 635, 635 and n. 1 (1982), a "public law remedy," *see* Hinkle, *Appellate Supervision of Remedies in Public Law Adjudication*, 4 Fla.St.U. L.Rev. 411, 411–13 (1976); Chayes, *The Role of the Judge in Public Law Litigation*, 89 Harv.L. Rev. 1281, 1313 (1976), and as "complex enforcement," *see* Note, *Complex Enforcement: Unconstitutional Prison Conditions*, 94 Harv.L. Rev. 626, 626 n. 1 (1981).

3. For instance, in the Arkansas prison litigation, Chief Judge Henley of the Eastern District of Arkansas continued to sit as a district judge by designation even after his appointment to the Eighth Circuit. *See Finney v. Hutto*, 410 F.Supp. 251 (E.D.Ark.1976); O. Fiss & D. Rendleman, Injunctions 528–752 (2d ed. 1984) (case study of Arkansas prison litigation). *See generally* M. Harris & K. Spiller, After Decision: Implementation of Judicial Decrees in Correctional Settings (1977).

may be hampered by unnecessary appellate interference.

However, the choice of remedy in structural litigation also involves several factors weighing in favor of close appellate review. First, the very familiarity that allows a district court to design an effective remedy may lead to excessive involvement and a breakdown of institutional perspective. *See* Fiss, *The Social and Political Foundations of Adjudication,* 6 Law & Human Behav. 121, 126 (1982). The court of appeals, which enjoys greater distance from the daily affairs of the litigation, is in a better position to assure detached neutrality. *See* Hinkle, *supra,* at 441.

Second, structural litigation frequently involves a close association of rights and remedies. *See* Note, *Complex Enforcement: Unconstitutional Prison Conditions,* 94 Harv.L.Rev. 626, 637–40 (1981). As we have noted above, the scope of federal injunctive relief against an agency of state government must be narrowly tailored to enforce constitutional requirements only. The adoption of a remedy in a particular case tends to establish the norm that defines the future standard of conduct.[4] The precedential value of the adoption of a particular remedy raises questions of consistency and authoritativeness that can be resolved similarly to resolution of legal questions.

Third, and perhaps most importantly, a federal district court's exercise of discretion to enjoin state political bodies raises serious questions regarding the legitimacy of its authority. *See* Fletcher, *The Discretionary Constitution: Institutional Remedies and Judicial Legitimacy,* 91 Yale L.J. 635, 642–44 (1982). Other than appellate review, few effective external controls check the district court's power.

■ Our weighing of the above factors leads us to the following standard of review. We will scrutinize the injunction closely to make sure that the remedy protects the plaintiffs' constitutional rights and does not require more of state officials than is necessary to assure their compliance with the constitution. Within these parameters, we will defer to the district court.

## IV

### THE EXISTENCE OF A LIBERTY INTEREST

■ The fourteenth amendment provides that no state shall "deprive any person of life, liberty, or property without due process of law ..." U.S. Const. amend. XIV, § 1; *see Hewitt v. Helms,* 459 U.S. at 466, 103 S.Ct. at 868. Our threshold inquiry, therefore, is whether plaintiffs have a liberty interest in remaining in the general population. If plaintiffs do not possess a liberty interest, the constitution does not require prison officials to accord plaintiffs any procedural protections when deciding to segregate plaintiffs for administrative reasons. *See Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976).

■ A liberty interest may arise from either of two sources: the due process clause itself or state law. *Hewitt,* 459 U.S. at 466, 103 S.Ct. at 868. In *Wright I,* the district court held that California prisoners possessed liberty interests on both grounds. First, the court held that the due process clause itself prohibits arbitrary placement of prisoners in administrative segregation. The court reasoned that:

> When a prisoner is transferred from the general prison population to the grossly more onerous conditions of maximum security, be it for disciplinary or for administrative reasons, there is a severe impairment of the residuum of liberty which he retains as a prisoner—an impairment which triggers the requirement for due process safeguards.

*See Grummett v. Rushen,* 779 F.2d 491, 496–97 (9th Cir.1985) (Sneed, J., concurring). Nevertheless, we recognize the tendency to adopt remedies that have survived appellate review.

---

4. We do not mean to imply that the adoption of a particular remedy in a given case requires the use of that remedy in another case. Indeed, we share Judge Sneed's view that courts should hesitate before "constitutionalizing" a remedy.

462 F.Supp. at 402. Second, the court held that section 3330 of Chapter 4, Article 6 of the Rules and Regulations of the Director of Corrections constituted a state-created liberty interest.[5] The district court assumed that the *Wright I* decision was law of the case in these proceedings. 597 F.Supp. at 1416. Plaintiffs, similarly, contend that we are bound by *Wright I,* especially in light of the Supreme Court's summary affirmance.

## A. Law of the Case

The doctrine of law of the case was "crafted with the course of ordinary litigation in mind. Such litigation proceeds through preliminary stages, generally matures at trial, and produces a judgment, to which after appeal, the binding finality of res judicata and collateral estoppel will attach." *Arizona v. California,* 460 U.S. 605, 618–19, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983). Here, however, we review a structural injunction, which involves the ongoing application of changing law to changing circumstances.

 Because permanent injunctive relief controls future conduct, we are sensitive to the need for modification when circumstances change.

A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need. The distinction is between restraints that give protection to rights fully accrued upon facts so nearly permanent as to be substantially impervious to change, and those that involve the supervision of changing conduct or conditions and are thus provisional and tentative.... [A] court does not abdicate its power to revoke or modify its mandate if satisfied

that what it has been doing has been turned through changing circumstances into an instrument of wrong.

*United States v. Swift & Co.,* 286 U.S. 106, 114–15, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932) (citations omitted). A change in the law may constitute a changing circumstance requiring the modification of an injunction. *System Federation No. 91 v. Wright,* 364 U.S. 642, 647–48, 81 S.Ct. 368, 371, 5 L.Ed.2d 349 (1961). An intervening judicial opinion may require modification of an injunction. *See Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 437–38, 96 S.Ct. 2697, 2705, 49 L.Ed.2d 599 (1976) (when intervening clarification of constitutional law reduced obligations of state officials, district court abused its discretion by refusing to modify injunction accordingly). "When a change in the law authorizes what had previously been forbidden, it is an abuse of discretion for a court to refuse to modify an injunction founded on superseded law." *American Horse Protection Association v. Watt,* 694 F.2d 1310, 1316 (D.C.Cir.1982).[6]

The Fourth Circuit's decision in *Nelson v. Collins,* 659 F.2d 420 (4th Cir.1981), is closely analogous to the instant case. In *Nelson,* the district court found "double celling" of inmates to be cruel and unusual punishment and ordered the prison administration to cease double celling. *Id.* at 421. The Fourth Circuit affirmed the district court's legal conclusions but remanded with instructions to fashion a decree that incorporated defendants' timetable for elimination of overcrowding. *Id.; see Johnson v. Levine,* 588 F.2d 1378 (4th Cir. 1978) (en banc). The district court modified its decree accordingly. *See* 659 F.2d at 421 (procedural background of case). When de-

---

**5.** At the time of the district court's decision in *Wright I,* 15 Cal.Admin.Code § 3330 provided:

§ 3330. General Policy. (a) Inmates must be segregated from others when it is reasonably believed that they are a menace to themselves and others or a threat to the security of the institution. Inmates may be segregated for medical, psychiatric, disciplinary, or administrative reasons. The reason for ordering segregated housing must be clearly doc-

umented by the official ordering the action at the time the action is taken.
462 F.Supp. at 403.

**6.** *See also* Wright & Miller, *Federal Practice & Procedure,* § 2961, pp. 604–605 (1973) ("The three traditional reasons for ordering the modification or vacation of an injunction are (1) changes in operative facts, (2) changes in the relevant decisional law, and (3) changes in any applicable statutory law").

fendants realized that they could not comply with prescribed timetables, they moved to modify the injunction. *See id.* at 423. In April of 1981, the district court denied the motion, found defendants in civil contempt, and imposed sanctions. *See id.* Defendants appealed. *Id.* On June 15, 1981, the Supreme Court decided *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), which held, in short, that double celling does not violate the eighth amendment. The Fourth Circuit vacated the district court's order disapproving double celling. *See* 659 F.2d at 429. The Fourth Circuit also vacated the civil contempt citation and imposition of sanctions. *Id.* The Fourth Circuit reasoned that "[t]he question for purposes of decision here becomes, therefore, whether there have been, since the entry of the original Decree in these cases, changes in either operative facts or laws which cast a new light upon the facts or law as originally ruled on in these cases." *Id.* at 424. The *Nelson* court found that *Rhodes v. Chapman,* and *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), mandated a different result from that reached by the court sitting en banc. 659 F.2d at 424–29.[7]

The Eleventh Circuit's opinion in *Newman v. Graddick,* 740 F.2d 1513 (11th Cir. 1984), similarly demonstrates that structural injunctive relief must follow the changing contours of constitutional law. In *Newman,* the district court ordered prison administrators to show cause why they should not be held in contempt for violating prior orders of the court concerning the Alabama state prison system. *Id.* at 1519. The district court also ordered that prisoners be released from confinement to relieve overcrowding. *Id.* The Eleventh Circuit vacated the order. *Id.* at 1522. The court held that "total compliance with a prior judgment or consent decree is not required before a court can entertain a request for modification." *Id.* at 1519–20. The Eleventh Circuit further held that the Supreme Court's intervening decision in *Rhodes v. Chapman,* along with changed factual circumstances, required reconsideration of the propriety of injunctive relief. *Id.* at 1521.[8]

■ Similarly, we cannot rely on *Wright I.* Neither premise upon which the *Wright I* court relied in finding a liberty interest still exists.

In *Hewitt v. Helms,* the Supreme court held that the due process clause does not of its own force create a liberty interest in freedom from administrative segregation.

It is plain that the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sen-

---

**7.** The standards for modification of an injunction should apply with equal, if not greater vigor, to direct appeals of an order of permanent injunctive relief. A modification under Fed.R.Civ.P. 60(b)(5) implicates the judicial ideals of repose and finality; a settled decision may be overturned. A direct appeal of an order of a permanent injunction, however, does not implicate repose or finality. Therefore, the procedural distinctions between a motion to modify an injunction and a direct appeal do not justify a more deferential approach in the case of direct appeals.

The Eighth Circuit's decision in *Finney v. Arkansas Board of Correction,* 505 F.2d 194 (8th Cir.1974), supports this conclusion. In *Finney,* the district court granted injunctive relief regarding disciplinary procedures employed in the Arkansas prison system. *Id.* at 208. After the district court ordered relief, the Supreme Court decided *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The Eighth Circuit found that *Wolff* required a great-

er measure of relief and ordered the district court to modify its decree accordingly. 505 F.2d at 208. In *Finney,* the court of appeals applied intervening law in a direct appeal of a district court's order of injunctive relief. We find ourselves in a similar procedural position.

**8.** In *Graddick,* the Eleventh Circuit considered the prospect that a motion to modify an injunction would be used as a dilatory tactic. The Eleventh Circuit reasoned that:

The contention could be made that this decision would simply mean that the defendants could continually delay enforcement of a remedy for unconstitutionality by seeking modification every time enforcement is sought. This should not be a necessary result. The good faith of the defendants and the substantiality of the alleged improvements would always be a consideration before a hearing on modification would be required.

740 F.2d at 1521. We agree.

tence.... Accordingly, administrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration.

*Hewitt,* 459 U.S. at 468, 103 S.Ct. at 869. A liberty interest does not arise even when administrative segregation imposes "severe hardships," such as "denial of access to vocational, educational, recreational, and rehabilitative programs, restrictions on exercise, and confinement to [one's] cell for lengthy periods of time." *See id.* at 467 n. 4, 103 S.Ct. at 869 n. 4; *Clark v. Brewer,* 776 F.2d 226, 228–30 (8th Cir.1985) (due process clause itself does not create liberty interest notwithstanding the fact that conditions in "close management" are significantly more harsh than conditions in general population); *see also McFarland v. Cassady,* 779 F.2d 1426, 1427–28 (9th Cir.1986) (Supreme Court in *Hewitt* held that due process clause does not give inmate liberty

interest in remaining in general population). Therefore, the *Wright I* court's holding that the due process clause creates a liberty interest in remaining in the general population is no longer correct.

■■■ The *Wright I* court's reliance on section 3330 is entitled to no deference. The version of section 3330 upon which the *Wright I* court relied has been repealed. *See* 15 Cal.Admin.Code § 3330 (former section 3330 was repealed on April 18, 1980).[9] A state-created liberty interest exists only as long as the statute or regulation creating it remains effective. If the state repeals the statute or eliminates the regulation, the liberty interest ceases to exist. *Clark v. Brewer,* 776 F.2d at 232. The *Wright I* liberty interest determinations, therefore, neither guide nor control our consideration today.[10]

Therefore, the doctrine of law of the case does not preclude review of the continuing propriety of permanent injunctive relief.[11]

---

**9.** Because section 3330 has been repealed, we need not consider whether the language of that section would create a liberty interest under current standards.

**10.** The plaintiffs argue that the Supreme Court in *Hewitt* reaffirmed its summary affirmance of *Wright I.* We disagree. In *Hewitt,* the Court merely noted that its summary affirmance of *Wright I* was the only case in which the Court had found that state statutes or regulations created a liberty interest in freedom from segregated housing within a prison. 459 U.S. at 469, 103 S.Ct. at 870. The Court neither reaffirmed nor rejected its holding in *Wright I*; the reference to *Wright I* was entirely neutral.

Plaintiffs point out that the Court in *Hewitt* had the opportunity to reject its earlier affirmance of *Wright I* yet failed to do so. Plaintiffs argue that the Court's silence indicates approval of *Wright I.* This argument seriously misapprehends the nature of judicial opinions. It is a well recognized maxim that a court ought to avoid unnecessary decisions. Such decisions are dicta. The Court in *Hewitt* had no need to revisit *Wright I.* We refuse to attribute a hidden meaning to the Court's failure to engage in obiter dictum.

**11.** Even if the doctrine of law of the case applied in its usual manner, its strictures would not require blind obeisance to outdated legal principles. As the Supreme Court noted in *Arizona v. California, supra:*

Unlike the more precise requirements of res judicata, law of the case is an amorphous

concept. As most commonly defined, the doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. Law of the case directs a court's discretion, it does not limit the tribunal's power.

460 U.S. at 618, 103 S.Ct. at 1319 (citations omitted). We have recognized that the doctrine is not to be applied woodenly. *Russell v. Commissioner,* 678 F.2d 782, 785 (9th Cir.1982), and that we will reconsider issues that have previously been decided "if such a course is warranted by 'considerations of substantial justice.'" *United States v. Imperial Irrigation District,* 559 F.2d 509, 520 (9th Cir.1977) (quoting *Lehrman v. Gulf Oil Corp.,* 500 F.2d 659, 662–63 (5th Cir.1974), *cert. denied,* 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400 (1975)). We have also recognized that a prior decision should not be followed if "controlling authority has since made a contrary decision of the law applicable to such issues." *Kimball v. Callahan,* 590 F.2d 768, 771–72 (9th Cir.), *cert. denied,* 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979); *see Handi Investment Co. v. Mobil Oil Corp.,* 653 F.2d 391, 392–93 (9th Cir.1981) (examining intervening case law to determine whether contrary result was proper); *see also Amen v. City of Dearborn,* 718 F.2d 789, 794 (6th Cir.1983) (doctrine of law of the case "must yield to an intervening change of controlling law between the date of the first ruling and the retrial"); *In re Multi-Piece Rim Products Liability Litigation,* 653 F.2d 671, 678 (D.C.Cir.1981) (decision may be reexamined in

The relevant question becomes whether intervening changes in law or fact require different results.

## B. Eighth Amendment Liberty Interest

■ Plaintiffs argue that the existence of eighth amendment violations in the administrative segregation units raises a due process liberty interest. We disagree.

Plaintiffs' sole authority for this proposition is a footnote from Justice Stevens' dissenting opinion in *Hewitt v. Helm.* We find this a curious use of authority. Not only is the sole authority a footnote from a dissenting opinion, but the footnote does not support plaintiffs' position. Justice Stevens indicated that if such eighth amendment violations existed, "the Constitution would impose substantive, *rather than procedural limits* on transfers into segregated status." 459 U.S. at 481 n. 4, 103 S.Ct. at 876 n. 4 (emphasis added).

■ Some fundamental considerations support Justice Stevens' conclusion. The state has no right to subject a prisoner to cruel and unusual punishment. The eighth amendment is not a "maybe" or a "sometimes" proposition. If conditions violate the eighth amendment, *all* prisoners have the right to be free of such conditions. The right does not vary depending on the threat that the individual prisoner presents to institutional security. No amount of process can justify subjecting a prisoner to cruel and unusual punishment.

Moreover, acceptance of such an argument would create an unworkable standard. The assumption implicit in plaintiffs'

argument is that eighth amendment violations exist in the segregation unit but do not exist in the general population. If both locations were infected with eighth amendment violations, process would be a meaningless gesture; it would make no sense to interpose a constitutional impediment to transfer from one place to another when the conditions in both locations are constitutionally impermissible.[12]

Assuming arguendo that the conditions in the general population lacked significant eighth amendment violations, we would have to determine what quantum of violation in administrative segregation would be sufficient to create an eighth amendment liberty interest. *Wright v. Rushen,* 642 F.2d at 1133–35, counsels that we consider separately each condition that allegedly contributes to the violation of plaintiffs' eighth amendment rights; a variety of discrete conditions exist in the segregation units. If we were to find that the defendants cured one of the conditions, would the eighth amendment liberty interest evaporate? Or if we were to find that a particular condition in the general population violated the eighth amendment, would the liberty interest vanish? Or perhaps plaintiffs would have us hold that a prisoner has an interest in remaining with his own eighth amendment violation and not being subjected to another in its place. Plaintiffs' approach would require a comprehensive determination regarding the conditions throughout the prison, if not the entire state prison system, to determine whether the eighth amendment created a due process liberty interest. We decline to require

light of changes in governing law); *EEOC v. International Longshoreman's Ass'n,* 623 F.2d 1054, 1058 (5th Cir.1980) (law of the case does not apply when controlling authority has since made a contrary decision of law inapplicable), *cert. denied,* 451 U.S. 917, 101 S.Ct. 1997, 68 L.Ed.2d 310 (1981); *White v. Murtha,* 377 F.2d 428, 431–32 (5th Cir.1967) (intervening controlling decision constitutes exception to doctrine of the law of the case), *cited with approval in Arizona v. California,* 460 U.S. at 618 n. 8, 103 S.Ct. at 1391 n. 8.

**12.** The conditions at San Quentin perfectly illustrate the infirmities of plaintiffs' argument.

While we focus on the conditions in administrative segregation, state-court litigation is currently addressing the problems in San Quentin's general population. *See Wilson v. Deukmejian,* No. 103454 (Sup.Ct. Marin County, August 5, 1983) (Tentative Decision and Proposed Statement of Decision; Savitt, J.). Although we hesitate to venture into areas beyond the scope of this case, we cannot ignore reality. Judge Savitt's proposed decision paints as bleak a picture of the conditions in San Quentin's general population as does Judge Weigel's description of the segregation units.

such an ambitious task in the name of such a dubious proposition.

The presence of eighth amendment violations in the segregation units, therefore, does not create a liberty interest. We will not parlay one constitutional right into another.

## C. State-Created Liberty Interest

■ Several cases decided after the Supreme Court affirmed the district court's decision in *Wright I* illuminate our perspective on state-created liberty interests. Before we will recognize a constitutionally protected liberty interest, state law must direct that a given action will be taken or avoided only on the existence or nonexistence of specified substantive predicates. *See Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983); *Hewitt v. Helms,* 459 U.S. 460, 470–72, 103 S.Ct. 864, 870–71, 74 L.Ed.2d 675 (1983); *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex,* 442 U.S. 1, 11–12, 99 S.Ct. 2100, 2106, 60 L.Ed.2d 668 (1979); *Meachum v. Fano,* 427 U.S. 215, 226–27, 96 S.Ct. 2532, 2539, 49 L.Ed.2d 451 (1976); *Allen v. Board of Pardons,* 792 F.2d 1404 (1986); *Roberts v. Spalding,* 783 F.2d 867, 870 (9th Cir.1986); *McFarland v. Cassady,* 779 F.2d 1426, 1428 (9th Cir.1986); *Rizzo v. Dawson,* 778 F.2d 527, 530 (9th Cir.1985); *Baumann v. Arizona Department of Corrections,* 754 F.2d 841, 844 (9th Cir.1985).

[14] The adoption of guidelines to structure the exercise of discretion does not necessarily create a liberty interest. *Roberts v. Spalding,* 783 F.2d at 870; *Baumann v. Arizona Department of Corrections,* 754 F.2d at 844. As the Supreme Court has stated,

The creation of procedural guidelines to channel the decision-making of prison officials is, in the view of many experts in the field, a salutary development. It would be ironic to hold that when a state embarks on such desirable experimentation it thereby opens the door to scrutiny by the federal court, while states that choose not to adopt such procedural provisions entirely avoid the strictures of the Due Process Clause. The adoption of such procedural guidelines, without more, suggests that it is these restrictions alone, and not those federal courts might also impose under the Fourteenth Amendment, that the state chose to require.

*Hewitt v. Helms,* 459 U.S. at 471, 103 S.Ct. at 871.

### 1) *The California Statutory Sentence Credit Scheme*

The district court held that California Penal Code sections 2931 through 2933 [13] create a liberty interest in sentence reducing credits. 597 F.Supp. at 1416–17.

In a nutshell, sections 2931 and 2933 create a two-tiered scheme:

Penal Code section 2933 provides that a state prison inmate may receive six months of worktime credit for every six months of full-time performance in a credit qualifying work, training or education program established by the Director of Corrections. Prisoners willing to participate in a full-time credit qualifying assignment, but who either are not assigned to such a program, or are assigned for less than full time, are to earn credits under the formula provided for by Penal Code section 2931, which is a four-month combined work and good behavior credit for each eight months served.

*People v. Vallardes,* 162 Cal.App.3d 312, 320, 208 Cal.Rptr. 604, 608 (1984).

■ Examination of section 2933 leads to the conclusion that prisoners have no right to earn the one-for-one worktime credits provided by that section. Section 2933 provides that "[w]orktime credit is a privilege, not a right." Cal.Penal Code § 2933(b). Section 2933 expressly contemplates that not all prisoners will be assigned to a credit qualifying program. *See* Cal.Penal Code § 2933(a) (" ... every prisoner willing to participate in a full-time

---

**13.** See Appendix.

credit qualifying assignment but who is either not assigned to full-time assignment or is assigned to a program for less than full time, shall receive no less credit than is provided under section 2931"). Although the California legislature intended the worktime sentence reducing scheme to instill a work ethic, *see People v. Vallardes,* 162 Cal.App.3d at 321, 208 Cal.Rptr. at 609, it did not create an absolute right to participate in work programs; the legislature created only a "reasonable opportunity." *See* Cal.Penal Code § 2933(b).

Moreover, a prisoner's "reasonable opportunity to participate" must be "consistent with institutional security and available resources." *See* Cal.Penal Code § 2933(b). Section 2933 delegates broad authority to the Director of Corrections to allocate worktime resources between various categories of prisoners. *See, e.g., In re Barnes,* 176 Cal.App.3d 235, 221 Cal.Rptr. 415, 416–17 (1985) (Department of Corrections has established priority list; segregation unit prisoners are at bottom of list). Prisoners are not entitled automatically to participate in worktime credit programs. *People v. Rosaia,* 157 Cal.App.3d 832, 848, 203 Cal.Rptr. 856, 867 (1984). There is no guarantee that work programs will be available. *People v. Caruso,* 161 Cal. App.3d 13, 16 n. 5, 207 Cal.Rptr. 221, 224 n. 5 (1984). In sum, section 2933 merely creates a possibility of early release; it does not create a constitutionally protected liberty interest. *See Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex,* 442 U.S. 1, 8–11, 99 S.Ct. 2100, 2104–05, 60 L.Ed.2d 668 (1979). Therefore, we conclude that section 2933 does not create a liberty interest in one-for-one worktime credits.

This conclusion, however, does not address the question of whether section 2933 creates a liberty interest in the one-for-two goodtime credits provided by section 2931. Section 2931 applies by its own terms to prisoners who are incarcerated for crimes committed prior to January 1, 1983 and who have not waived the right to receive credits under section 2931. Cal.Penal Code §§ 2931(d), 2934; *see In re Ramirez,* 39

Cal.3d 931, 933, 705 P.2d 897, 899, 218 Cal.Rptr. 324, 325–26 (1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 2266, 90 L.Ed.2d 711 (1986). More importantly for our purposes, section 2933 establishes that prisoners who are willing to participate in the worktime credit scheme but who are denied the opportunity to do so through no fault of their own "shall receive no less credit than is provided under Section 2931." Cal.Penal Code § 2933(a).

Section 2931 provides that a prisoner's sentence may be reduced by four months for every eight months that the prisoner serves. Three of the four months accrue automatically if the prisoner commits no illegal acts or serious disciplinary infractions. Cal.Penal Code § 2931(b). One of the four months is based solely on participation in "work, educational, vocational, therapeutic or other prison activities." Cal.Penal Code § 2931(c). In practice, this one month credit is granted unless a prisoner refuses to accept work when offered. *People v. Austin,* 30 Cal.3d 155, 161–62, 636 P.2d 1, 5, 178 Cal.Rptr. 312, 316 (1981); 15 Cal.Admin.Code § 3043; Cal.Penal Code §§ 2931(c), 2932(b); *see also People v. Sage,* 26 Cal.3d 498, 510 n. 1, 611 P.2d 874, 880–81 n. 1, 165 Cal.Rptr. 280, 286 n. 1 (1980) (Bird, C.J., concurring and dissenting).

 While section 2931 differs somewhat from the Nebraska statute at issue in *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), in all material respects it is identical. Section 2931 contains the "shall/unless" formula that we find dispositive. *See Baumann v. Arizona Department of Corrections,* 754 F.2d 841, 844 (9th Cir.1985). Therefore, we conclude that section 2931 creates a constitutionally protected liberty interest.

 The conclusion that section 2931 creates a liberty interest, however, does not assist plaintiffs in this case. Since the defendants generally grant the credit to segregated prisoners, administra-

tive segregation does not implicate the liberty interest arising from sections 2931 and 2933. The existence of a liberty interest, therefore, is irrelevant and cannot support the district court's holdings.[14]

### 2) *California Decisional Law*

The plaintiffs argue that "by virtue of its appellate court decisions applying its constitution, California has created a "substantial liberty interest in not being placed in lockup by arbitrary procedures." Plaintiffs primarily rely on *Conti v. Dyer*, 593 F.Supp. 696 (N.D.Cal.1984).

In *Conti*, the district court held that California state-court decisions created a liberty interest cognizable under the federal Constitution. *Id.* at 700–02. The *Conti* court found that California decisional law created a federal liberty interest notwithstanding the fact that the California courts expressly reject federal due process analysis and recognize a liberty interest in freedom from all arbitrary state action. *Id.* at 701; *see People v. Ramirez*, 25 Cal.3d 260, 268, 599 P.2d 622, 627, 158 Cal.Rptr. 316, 320 (1979) ("When an individual is subjected to the deprivatory governmental action he always has a due process liberty interest both in fair and unprejudiced decision making and in being treated with respect and dignity."); *see also Inmates of Sybil Brand Institute for Women v. County of Los Angeles*, 130 Cal.App.3d 89, 108, 181 Cal.Rptr. 599, 609 (1982).

The district court's decision in *Conti* is not persuasive for several reasons. First, the court failed to acknowledge that the due process clause of the fourteenth amendment and the due process clause of the California constitution seek to protect qualitatively different interests. Under the fourteenth amendment, when the state deprives a person of liberty, it must provide that person with procedural protection. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). Un-

less a liberty interest is implicated, arbitrary state action does not violate the fourteenth amendment. *Hewitt*, 459 U.S. at 466–69, 103 S.Ct. at 868–70. The due process clause of the fourteenth amendment focuses in relevant part on protecting liberty. The due process clause of the California constitution also seeks to protect liberty. But in addition, the due process clause of the California constitution seeks to promote accuracy and reasonable predictability in all government decision making when individuals are subject to any deprivatory action. *People v. Ramirez*, 158 Cal.Rptr. at 320. The California constitution does not impose the threshold requirement that a liberty interest exist. *Id.*

Even though the distinction between the two approaches will be academic in some instances, the distinction is critical in prisoners' rights cases. Under federal due process analysis, a legally incarcerated prisoner is stripped of all but the most incremental interest in liberty. *Hewitt*, 459 U.S. at 467, 103 S.Ct. at 869; *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). The federal perspective instructs that arbitrary decision making cannot deprive a person of that which has already been taken. *Greenholtz*, 442 U.S. at 8–11, 99 S.Ct. at 2104–05. The threshold inquiry, therefore, is whether the state has given back to the prisoner some liberty interest that previously the state had taken away. Stated alternatively, we must determine to what extent the state has deprived a criminal defendant of liberty in the first place.

 For federal purposes, the extent and nature of the prisoner's remaining or re-created liberty is determined by looking for the *substantive* conditions or predicates that must exist before the state can again take the liberty away. *Baumann v. Arizona Department of Corrections*, 754

---

14. The district court found that credits due under sections 2931 and 2933 are not invariably afforded. To the extent that the defendants may from time to time deny the credits due under sections 2931 and 2933, without affording a prisoner due process of law, that prisoner may obtain habeas corpus relief. *See Preiser v. Rodriguez*, 411 U.S. 475, 500, 93 S.Ct. 1827, 1841, 36 L.Ed.2d 439 (1973).

F.2d 841, 843–45 (9th Cir.1985).[15] The quantity of procedural protections that a state may offer prisoners is not dispositive in determining the existence of a federal liberty interest. *Greenholtz,* 442 U.S. at 7, 99 S.Ct. at 2103. As the Court in *Olim v. Wakinekona* stated,

> "[a] liberty interest is of course a substantive interest of an individual; it cannot be the right to demand needless formality." [*Shango v. Jurich,* 681 F.2d 1091, 1100–01 (7th Cir.1982).] Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement.

461 U.S. at 250, 103 S.Ct. at 1748 (footnote omitted).

In contrast, the California due process clause requires process notwithstanding the absence of substantive predicates or conditions. *People v. Ramirez,* 158 Cal. Rptr. at 320. The state's provision of additional protection is entirely permissible. But the fact that the state courts call this additional protection a liberty interest does not make it so for the purposes of the federal constitution. Although a state court's determination of state law binds the federal courts, interpretation of the federal constitution cannot be circumscribed by state definitions. The California cases requiring heightened procedural protection, therefore, do not create a federally cognizable liberty interest.

### 3) *California Prison Regulations*

The plaintiffs argue that sections 3335 and 3336 of Title 15 of the California Administrative Code create a liberty interest. These sections govern the placement and retention of prisoners in administrative segregation.

Our hesitance to construe a statute or regulation as creating a liberty interest is especially great when the statute or regulation governs the day-to-day administration of a prison. Again, *Hewitt* instructs that

> The deprivations imposed in the course of daily operations of an institution are likely to be minor when compared to the release from custody at issue in parole decisions and goodtime credits. Moreover, the safe and efficient operation of a prison on a day-to-day basis has traditionally been entrusted to the expertise of prison officials.... These facts suggest that regulations structuring the authority of prison administrators may warrant treatment, for purposes of creation of entitlements to "liberty," different from statutes and regulations in other areas.

*Hewitt v. Helms,* 459 U.S. at 470, 103 S.Ct. at 870 (citations omitted). Accordingly, we have noted in the context of inter-institutional transfers that "[u]nless there is some *guarantee* that transfer will not be effected except for misbehavior or some other specified reason, due process protections *cannot* apply." *Rizzo v. Dawson,* 778 F.2d at 530 (emphasis added).

 We are convinced that sections 3335 and 3336, standing alone, do not create a liberty interest. However, when read in conjunction with section 3339 of the California Administrative Code, sections 3335 and 3336 withstand our exacting scrutiny; they create a constitutionally protected liberty interest.

Section 3335 [16] specifies those circumstances requiring the immediate removal of an inmate from the general population. Nothing in section 3335 purports to limit the Department of Correction's authority to segregate inmates to the circumstances enumerated in that section. The only mandatory language in section 3335 runs to the benefit of prisoners in the general popula-

---

**15.** The difference between substantive and procedural predicates to denial of liberty can be illustrated as follows. A person cannot be imprisoned unless he is tried. The trial is the procedural predicate to imprisonment. But merely affording a person a trial does not entitle the state to imprison a person; the state must prove the person's guilt. Guilt is the substantive predicate to imprisonment. The procedural predicate merely assists in determining the existence of the substantive predicate.

**16.** See Appendix.

tion; they have some expectation that their dangerous neighbors will be removed *to* administrative segregation. Nothing in section 3335 suggests that a prisoner shall be allowed to *remain* in the general population absent the specified circumstances.

Section 3336 [17] contains mandatory language running to the benefit of the segregated prisoner. Specifically, section 3336 requires that a sufficiently senior officer make the segregation decision, that the decision be documented, that the prisoner receive assistance, if needed, in presenting his case, and that the prisoner be informed of the reason for his segregation. Sections 3335 and 3336 standing alone, therefore, constitute a procedural guideline that "channel[s] the decision-making of prison officials." *See Hewitt*, 459 U.S. at 471, 103 S.Ct. at 871. Such procedural requirements, even if mandatory, do not raise a constitutionally cognizable liberty interest. *Olim v. Wakinekona*, 461 U.S. at 250, 103 S.Ct. at 1748.

However, section 3339(a) provides that "[r]elease from segregation status *shall* occur at the earliest possible time in keeping with the circumstances and reasons for the inmate's initial placement in administrative segregation." 15 Cal.Admin.Code § 3339(a) (emphasis added). Section 3339(a) indicates that absent justification, a prisoner may not be retained in administrative segregation. The use of the word, shall, constitutes the mandatory language needed to create a liberty interest. *See Hewitt*, 459 U.S. at 471–72, 103 S.Ct. at 871.

As the Supreme Court reasoned in *Hewitt*, the word "shall" alone is not sufficient. Rather, the liberty interest is created when the word "shall" is used to mandate certain procedures "in connection with requiring *specific substantive predicates* for action." 459 U.S. at 472, 103 S.Ct. at 871 (emphasis added). Those substantive predicates are contained in section 3335, and include standards for removal from the general inmate population where there is an immediate threat to the inmate's own safety or the safety of others, or when institutional security is endangered or the integrity of an investigation put in jeopardy. These standards are incorporated into section 3339 by that section's reference to "the circumstances and reasons for the inmate's initial placement in administrative segregation." We think, therefore, that the word "shall," read in conjunction with these specific substantive predicates, does create a liberty interest in the present case. We note, moreover, that the word "shall" is not used simply to mandate an investigation but to mandate immediate release, absent procedures that determine that the substantive predicates for retaining the inmate in restrictive custody are demonstrated.

## V

## PROCEDURAL REQUIREMENTS GOVERNING PLACEMENT AND RETENTION IN ADMINISTRATIVE SEGREGATION

### A. PLACEMENT

Our conclusion that the state has created a liberty interest in freedom from administrative segregation requires us to determine the quantum of process required by the fourteenth amendment. The determination of what process is due

> generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). "It is axiomatic that due process 'is flexible and calls for such procedural protections as the particular situation demands.'" *Green-*

---

**17.** See Appendix.

*holtz v. Inmates of the Nebraska Penal and Correctional Complex,* 442 U.S. 1, 12, 99 S.Ct. 2100, 2106, 60 L.Ed.2d 668 (1979) (quoting *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972)).

The district court incorporated the procedural requirements mandated by the three-judge court in *Wright I. See* 597 F.Supp. at 1424. The *Wright I* order followed the procedures required for disciplinary confinement and denial of good time credits established in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). *See Wright I,* 462 F.Supp. at 403–05.[18] The district court also established additional procedural requirements. The court ordered the defendants to release a prisoner no later than twelve months after placement in administrative segregation unless that prisoner is afforded all the hearing rights that attend the initial segregation decision. 597 F.Supp. at 1424. The court also required disclosure of the identity of any person providing information to prison authorities unless disclosure would endanger the safety of the source. *Id.* at 1424–25. Finally, the court prohibited segregation on the basis of undisclosed information. *Id.* at 1425.

In *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), the Supreme Court held that a lesser quantum of process is due when a prisoner is placed in administrative segregation than is required by *Wolff.* The Court stated:

> We think an informal, nonadversary evidentiary review is sufficient both for the decision that an inmate represents a security threat and the decision to confine an inmate to administrative segregation pending completion of an investigation into misconduct charges against him. An inmate must merely receive some no-

tice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation. Ordinarily, a written statement by the inmate will accomplish this purpose, although prison administrators may find it more useful to permit oral presentations in cases where they believe a written statement would be ineffective. So long as this occurs, and the decisionmaker reviews the charges and then available evidence against the prisoner, the Due Process Clause is satisfied.

459 U.S. at 476, 103 S.Ct. at 874. The process mandated for administrative segregation under *Hewitt,* therefore, is substantially less than that required by Part III of the Permanent Injunction.

Plaintiffs nonetheless argue that *Hewitt* is distinguishable and a higher quantum of process is due in the instant case. Plaintiffs argue that they have a greater private interest than did the prisoners in *Hewitt,* that the presence of eighth amendment violations requires heightened process, and that the defendants' noncompliance with prior court orders requires a highly structured administrative proceeding.

We disagree. We recognize that the segregation units at issue in *Hewitt* were modern facilities and that the segregation units at San Quentin and Folsom, in contrast, are riddled with conditions that violate the plaintiffs' eighth amendment rights. Nevertheless, the Court in *Hewitt* proceeded on the premise that placement in administrative segregation would result in "severe hardships." 459 U.S. at 467 n. 4, 103 S.Ct. at 869 n. 4. The hardships that a segregated prisoner in *Hewitt* would face included "denial of access to vocational, educational, recreational, and rehabilitative programs, restrictions on exercise, and con-

---

**18.** The *Wolff* procedures apply when a state, for disciplinary reasons, seeks to withdraw sentence credits that a prisoner already has acquired. *See Wolff,* 418 U.S. at 555–58, 94 S.Ct. at 2974–75. In *Wolff,* the Supreme Court held that a prisoner facing misconduct charges be accorded 24 hours' advance written notice of the charges against him; the right to call witnesses and

present documentary evidence in a manner consistent with institutional security; if illiterate, staff assistance in preparing a defense; an impartial tribunal; and a written statement explaining the basis of the tribunal's decision. *See Wolff v. McDonnell,* 418 U.S. at 563–72, 94 S.Ct. at 2978–82.

finement to [one's] cell for lengthy periods of time." *Id.; see id.* at 479–80 n. 1, 103 S.Ct. at 875–76 n. 1 (Stevens, J., dissenting). The distinction between the private interest at issue in *Hewitt* and that at issue here is not as extreme as the plaintiffs assert.

In addition, the state's interest in maintaining security in San Quentin and Folsom is at least as great, if not greater, than the state's interest shown in *Hewitt.* The inmate population at San Quentin and Folsom is composed of the most violent and anti-social offenders in the California prison system. *See* 597 F.Supp. at 1394, 1404–05. Given the disruptive propensities of the inmate population, we are especially sensitive to the Supreme Court's admonition that "[t]he safety of the institution's guards and inmates is perhaps the most fundamental responsibility of the prison administration." *Hewitt*, 459 U.S. at 473, 103 S.Ct. at 872.[19] The state's interest in maintaining safety and security weighs heavily in favor of avoiding prolonged and cumbersome administrative proceedings.

Finally, the value of *Wolff*-type procedures was minimal in the context of the decision to segregate a prisoner for administrative reasons. When determining whether the prisoner was guilty of misconduct, as was the case in *Wolff,* the inquiry is essentially factual. ·The prison administrator seeks to determine whether the prisoner committed the alleged offense. When deciding whether administrative segregation is needed, however, the administrator relies largely on subjective factors:

> In assessing the seriousness of a threat to institutional security, prison administrators necessarily draw on more than specific facts surrounding a particular incident; instead, they must consider the character of the inmates confined in the

institution, recent and longstanding relations between prisoners and guards, prisoners *inter se*, and the like. In the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of other prisoners and guards even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous incidents. The judgment of prison officials in this context, like that of those making parole decisions, turns largely on purely subjective evaluations and on predictions of future behavior; indeed, the administrators must predict not just one inmate's future actions, as in parole, but those of an entire institution.

*Hewitt v. Helms*, 459 U.S. at 474, 103 S.Ct. at 872–73 (citations omitted); *see also Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 132–33, 97 S.Ct. 2532, 2541, 53 L.Ed.2d 629 (1977); 15 Cal. Admin. Code § 3338(d), (e). A trial-like proceeding is unlikely to inform a prison administrator regarding such subjective considerations. *See Clark v. Brewer*, 776 F.2d at 235.

█ We conclude that when prison officials initially determine whether a prisoner is to be segregated for administrative reasons due process only requires the following procedures: Prison officials must hold an informal nonadversary hearing within a reasonable time after the prisoner is segregated.[20] The prison officials must inform the prisoner of the charges against the prisoner or their reasons for considering segregation. Prison officials must allow the prisoner to present his views.

█ We specifically find that the due process clause does not require detailed

---

**19.** Once again, we note that failure to remove dangerous prisoners from the general population may amount to a breach of the state's constitutional duties. *See Wright v. Rushen*, 642 F.2d at 1134 n. 3 (citing *Williams v. Edwards*, 547 F.2d 1206, 1211 (5th Cir.1977); *see also Thomas v. Booker*, 784 F.2d 299, 303 (8th Cir.) (en banc), *cert. denied*, —— U.S. ——, 106 S.Ct. 1975, 90 L.Ed.2d 659 (1986).

**20.** The district court's requirement that a hearing be held within 72 hours of segregation constitutes a "reasonable time." *See Hewitt v. Helms*, 459 U.S. at 476–78 nn. 8 & 9, 103 S.Ct. at 874 nn. 8 & 9. We intimate no view as to whether due process would tolerate a more lengthy delay.

written notice of charges, representation by counsel or counsel-substitute, an opportunity to present witnesses, or a written decision describing the reasons for placing the prisoner in administrative segregation. *Cf. Wright I*, 462 F.Supp. at 404–05; *Toussaint III*, 597 F.Supp. at 1424. We also find that due process does not require disclosure of the identity of any person providing information leading to the placement of a prisoner in administrative segregation. *Cf. Toussaint III*, 597 F.Supp. at 1424–25.

## B. RETENTION

In Part III(B)(1) of the Permanent Injunction, the district court ordered defendants to release prisoners from administrative segregation on the prisoner's Minimum Eligible Release Date or at the expiration of twelve months of consecutive confinement, whichever is shorter, unless the defendants afford the prisoner all the hearing rights that attend initial placement in segregation.

In *Hewitt*, the Supreme Court instructed that administrative segregation—

> may not be used as a pretext for indefinite commitment of an inmate. Prison officials must engage in some sort of periodic review of the confinement of such inmates. This review will not necessarily require that prison officials permit the submission of any additional evidence or statements. The decision whether a prisoner remains a security risk will be based on facts relating to a particular prisoner—which will have been ascertained when determining to confine the inmate to administrative segregation—and on the official's general knowledge of prison conditions and tensions, which are singularly unsuited for "proof" in any highly structured manner. Likewise, the decision to continue confinement of an inmate pending investigation of misconduct charges depends upon circumstances that prison officials will be aware of—most typically, the progress of the investigation.

*Hewitt*, 459 U.S. at 477 n. 9, 103 S.Ct. at 874 n. 9. The Third Circuit, similarly, has stated "the governmental interest involved in a good faith decision to subject a prisoner to administrative segregation may fluctuate with the passage of time and change of circumstances." *Mims v. Shapp*, 744 F.2d 946, 953 (3d Cir.1984).

In *Mims v. Shapp*, the Third Circuit found that monthly review of a prisoner's status satisfied due process concerns. 744 F.2d at 952. Similarly, in *Clark v. Brewer*, the Eighth Circuit held that review every seven days for the first two months of segregation followed by regular review hearings every thirty days thereafter satisfied due process requirements. 776 F.2d at 234. Here, however, segregation may continue without review for as long as twelve months. We do not believe that annual review sufficiently protects plaintiffs' liberty interest. However, we intimate no view as to the frequency of periodic review required. That is for the parties to recommend and the district court to decide in the first instance.

## VI

## SUBSTANTIVE CRITERIA GOVERNING PLACEMENT AND RETENTION IN ADMINISTRATIVE SEGREGATION

In Parts III(B) and IV(B) of the Permanent Injunction, the district court imposed criteria governing placement and retention of prisoners in administrative segregation. *See* 597 F.Supp. at 1424, 1426. The district court required that a prisoner not be placed or retained in segregation unless allowing the prisoner to remain in the general population would severely endanger the lives of prisoners, the security of the institution, or the integrity of an investigation into suspected criminal activity or serious misconduct. Defendants argue that these criteria impose unwarranted limitations on prison management.

On their face, the substantive requirements merely restate the reasons justifying administrative segregation. *See* 15 Cal.Admin. Code § 3335(a). In *Hewitt*, the Supreme Court recognized that "[t]he safety

of the institution's guards and inmates is perhaps the most fundamental responsibility of the prison administration." 459 U.S. at 473, 103 S.Ct. at 872. The substantive requirements accommodate this concern. The Court in *Hewitt* also stated that administrative segregation of a prisoner "pending investigation of charges against him serves important institutional interests relating to the insulating of possible witnesses from coercion or harm." *Id.* The substantive criteria accommodate the prison administration's interests in this regard as well. Moreover, the substantive criteria apply only to placement or retention in administrative segregation. The criteria do not impinge on defendants' ability to hold disciplinary hearings and to punish prisoners for misconduct. Since administrative segregation must not be a pretext for punitive isolation, *Hewitt*, 459 U.S. at 477 n. 9, 103 S.Ct. at 874 n. 9, the substantive criteria assure that plaintiffs' due process rights are not meaningless gestures. The district court, therefore, did not abuse its discretion in fashioning these substantive criteria.

## VII

### THE INTERIM PERIOD REMEDIES

In Part IV of the Permanent Injunction, the district court established an additional layer of relief to apply during the "interim period." The court defined the interim period as that time between the date on which

21. The Monitor is a special master, appointed pursuant to Fed.R.Civ.P. 53. *See* 597 F.Supp. at 1425.

22. Although Part IV of the Permanent Injunction speaks of "interim" relief, we question whether the district court can retain jurisdiction once the defendants meet the conditions specified in Part IV. *See generally Riddick v. School Board of the City of Norfolk*, 784 F.2d 521 (4th Cir.1986). Of course, this litigation has not reached a point demanding resolution of this question.

23. We note sua sponte that the district court's delegation to the Monitor of the power to order release raises serious constitutional questions. *See, e.g., Northern Pipeline Construction Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982); *United States v.*

the Permanent Injunction issued and the date on which the Monitor[21] certifies that defendants are "in full compliance with the Permanent Injunction and that conditions of confinement in segregation units at San Quentin and Folsom do not violate the Constitution." 597 F.Supp. at 1425.[22] The court ordered that any prisoner assigned to segregation could request release and, if the defendants denied the request, the prisoner could obtain review by the Monitor. The court empowered the Monitor to order the release of individual prisoners from administrative segregation. *Id.* at 1426.

### A. Habeas Corpus Jurisdiction

The defendants argue that the district court lacks jurisdiction under 42 U.S.C. § 1983 to order prisoners released from administrative segregation.[23] Defendants contend that under *Preiser v. Rodriguez*, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), the writ of habeas corpus is the exclusive federal remedy available to a prisoner who seeks to challenge the fact of confinement, and that the district court's order evades the requirement that the prisoner exhaust state remedies. *Preiser* does not support defendants' contentions.

In *Preiser*, state prisoners sued in federal district court under 42 U.S.C. § 1983 alleging that they were deprived of good-time credits improperly. 411 U.S. at 476, 93 S.Ct. at 1829. The prisoners sought injunctive relief to compel restoration of the credits. *Id.* The Supreme Court held

*Raddatz*, 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980); Fiss, *The Social and Political Foundations of Adjudication*, 6 Law & Human Behav. 121 (1982); Note, *Article III Constraints and the Expanding Civil Jurisdiction of Federal Magistrates: A Dissenting View*, 88 Yale L.J. 1023 (1979). We have found no case in which such a broad delegation of power to a special master has withstood review. Nevertheless, the defendants do not object to the delegation of power to the Monitor; defendants contest the authority of the court itself to order the release of prisoners from administrative segregation. Therefore, we refrain from deciding the question. However, we do not wish our silence to be taken as a ratification of the district court's order.

that "when a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus." *Id.* at 500, 93 S.Ct. at 1841.[24]

In *Wolff v. McDonnell,* 418 U.S. 539, 554–55, 94 S.Ct. 2963, 2973–74, 41 L.Ed.2d 935 (1974), however, the Supreme Court held that *Preiser* only precludes restoration of credits under 42 U.S.C. § 1983. The Court stated "that it was proper for the Court of Appeals and the District Court to determine the validity of the procedures for revoking good-time credits and to fashion appropriate remedies for any constitutional violations ascertained, *short of ordering the actual restoration of good time already cancelled." Id.* at 555, 94 S.Ct. at 2974 (footnote omitted; emphasis added).

■ Here, the district court did not restore credits nor release any prisoner from prison. The court, in essence, authorized the Monitor to move individual prisoners from one location to another within the prison. We do not believe that such relief falls within the traditional core of habeas corpus. Consequently, the plaintiffs need not exhaust state remedies before seeking relief in federal court. The district court did not exceed its jurisdiction by authorizing the release of prisoners from administrative segregation.

## B. Standard of Review Employed by the Monitor

Part IV(D) of the Permanent Injunction authorizes the Monitor to review records of defendants' placement and retention decisions, to accept additional evidence, and to order a prisoner's release "[i]f the Monitor concludes on the basis of all evidence submitted, that the prisoner was placed or

retained in segregation in violation of any provision of [the] Permanent Injunction...." 597 F.Supp. at 1416. Defendants argue that the district court abused its discretion by authorizing the Monitor to review defendants' placement and retention decisions de novo.

We have already determined that the district court properly imposed substantive standards to be used in deciding whether to segregate a prisoner or retain a prisoner in segregation. The question here is who should apply those standards and how much evidence is required in support of a segregation or retention decision.

Prison administrators, not courts, must run prisons:

[A] prison's internal security is peculiarly a matter normally left to the discretion of prison administrators. In assessing the seriousness of a threat to institutional security, prison administrators necessarily draw on more than specific facts surrounding a particular incident; instead, they must consider the character of the inmates confined in the institution, recent and longstanding relations between prisoners and guards, prisoners *inter se,* and the like. In the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of other prisoners and guards even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous incidents. The judgment of prison officials in this context, like that of those making parole decisions, turns largely on purely subjective evaluations and on predictions of future behavior; indeed, the administrators must predict not just one inmate's future actions, as in parole, but those of an entire institution.

*Hewitt,* 459 U.S. at 474, 103 S.Ct. at 873 (citations omitted); *see also Jones v. North*

---

24. The Court also stated in dictum that "when a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making the custody illegal." *Id.* 411 U.S. at 499, 93 S.Ct. at 1841. One court has

followed this reasoning and held that habeas corpus provided the exclusive remedy for obtaining an order compelling release from administrative detention. *Boudin v. Thomas,* 732 F.2d 1107, 1111–12 (2d Cir.1984).

*Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 132–33, 97 S.Ct. 2532, 2541, 53 L.Ed.2d 629 (1977).

Courts must accord wide-ranging deference to prison administrators "in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979). "[W]here state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities." *Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). We recognize, moreover, "that 'the relationship of state prisoners and the state officers who supervise their confinement is far more intimate than that of a state and a private citizen,' and that the 'internal problems of state prisons involve issues ... peculiarly within state authority and expertise.'" *Pell v. Procunier,* 417 U.S. 817, 825–26, 94 S.Ct. 2800, 2805, 41 L.Ed.2d 495 (1974) (quoting *Preiser v. Rodriguez,* 411 U.S. 475, 492, 93 S.Ct. 1827, 1837, 36 L.Ed.2d 439 (1973)). The need to restrict injunctive relief to enforcement of minimum constitutional rights is especially great when federal judicial relief threatens to usurp such highly discretionary state functions.

The Supreme Court's decision in *Superintendent v. Hill,* 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985), indicates that the due process clause requires only the existence of "some evidence" in support of a prison administrator's segregation decision. *Id.* at 2770.

In *Hill,* the plaintiff, a prisoner, was charged with misconduct for assaulting another inmate. *Id.* At the disciplinary hearing, a prison guard testified that he heard a scuffle, found the victim bleeding from the mouth, and observed the plaintiff and two other inmates jogging away down an enclosed corridor. *Id.* No evidence was adduced concerning which of the three retreating inmates caused the victim's injuries. *Id.* The victim provided written statements that the other inmates had not caused his injuries. *Id.* The prison disciplinary board withdrew 100 days of plaintiff's good time credit and ordered that plaintiff be confined in isolation for 15 days. *Id.* The plaintiff challenged the prison administration's decision in state court, which granted summary judgment in plaintiff's favor. *Id.* The Massachusetts Supreme Court affirmed on the ground that the record failed to reflect any evidence that would support the disciplinary board's findings. *Id.* at 2771. The United States Supreme Court reversed. *Id.*

The Court held that "revocation of good time does not comport with minimum requirements of procedural due process unless the findings of the prison disciplinary board are supported by some evidence in the record." *Id.* at 2773 (citations omitted). The Court held that the evidence recited above was sufficient. *Id.* at 2775. The Court's reasoning merits recitation at length:

> Where a prisoner has a liberty interest in good time credits, the loss of such credits threatens his prospective freedom from confinement by extending the length of imprisonment. Thus the inmate has a strong interest in assuring that the loss of good time credits is not imposed arbitrarily. This interest, however, must be accommodated in the distinctive setting of a prison, where disciplinary proceedings "take place in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so." Consequently, in identifying the safeguards required by due process, the Court has recognized the legitimate institutional needs of assuring the safety of inmates and prisoners, avoiding burdensome administrative requirements that might be susceptible to manipulation, and preserving the disciplinary process as a means of rehabilitation.
>
> Requiring a modicum of evidence to support a decision to revoke good time credits will help to prevent arbitrary dep-

rivations without threatening institutional interests imposing undue administrative burdens.

. . . . .

Because the written statement mandated by *Wolff* requires a disciplinary board to explain the evidence relied upon, recognizing that due process requires some evidentiary basis for a decision to revoke good time credits will not impose significant new burdens on proceedings within the prison. *Nor does it imply that a disciplinary board's factual findings or decisions with respect to appropriate punishment are subject to second-guessing upon review.*

We hold that the requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board to revoke good time credits. This standard is met if "there was some evidence from which the conclusion of the administrative tribunal could be deduced...." *Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board. We decline to adopt a more stringent evidentiary standard as a constitutional requirement. Prison disciplinary proceedings take place in a highly charged atmosphere, and prison administrators must often act swiftly on the basis of evidence that might be insufficient in less exigent circumstances. The fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact.*

Id. at 2774 (quotations and citations omitted, emphasis added).

The Court's decisions in *Hewitt* and *Hill* lead to two conclusions: First, the exigencies of prison administration allow prison administrators to make segregation decisions on the basis of "some evidence," including the administrator's experience and awareness of general prison conditions; second, a reviewing court may not reverse the administration's decision if "some evidence" supports the administration's decision.

Plaintiffs seek to distinguish *Hill* on the basis that "the issue before this Court is not what due process requires, but rather, whether the district court abused its discretion in formulating a remedy for proven violations of the Constitution (including Eighth Amendment Rights)." We reject this argument for reasons similar to those we gave in holding that eighth amendment violations do not create a liberty interest. *See supra* pages 1093–94. A prisoner who presents a clear security risk enjoys exactly the same eighth amendment protection as does the most placid prisoner. The fact that justification exists for segregating a particular prisoner will not assuage his sufferings. Therefore, close scrutiny of prison officials' segregation decisions will do little to protect plaintiffs' eighth amendment rights.[25]

We also do not consider the defendants' history of noncompliance with prior orders to constitute a valid reason for this court to arrogate to itself the discretion imposed on the defendants. The earlier orders demanded much more of the defendants than the law now requires. Our purpose is not to punish defendants for their past failures, but to enforce compliance with current constitutional standards. We perceive no reason why the defendants would be unwilling to comply with the requirements we have established. But even if the defendants failed to comply, de novo review by the court or the Monitor would be unwarranted. The district court could assure itself that the defendants were com-

---

**25.** Moreover, if Judge Savitt's conclusions regarding the conditions in the general population are correct, *see supra* note 12, interfering in segregation decisions, would be futile, at least as far as the San Quentin plaintiffs are concerned.

plying with the constitution simply by examining the record for "some evidence" in support of each challenged segregation decision. The district court abused its discretion by allowing the Monitor to substitute his discretion for that of the defendants.[26]

## VIII

## THE WORK REQUIREMENT

In Part III(C) of the Permanent Injunction, the district court ordered that no prisoner assigned to administrative segregation be denied the opportunity to participate in work, education, or vocational training programs. 597 F.Supp. at 1425.

### A. Due Process

 Plaintiffs contend that Part III(C) is necessary to the enforcement of plaintiffs' due process rights. This is not true. Requiring prison officials to provide work programs is an inappropriate remedy. The due process clause seeks to prevent denial of life, liberty or property by arbitrary decision. *Hewitt*, 459 U.S. at 476, 103 S.Ct. at 873; *Greenholtz*, 442 U.S. at 7, 99 S.Ct. at 2103. The due process clause requires procedure. *See Mathews v. El-*

*dridge*, 424 U.S. at 335, 96 S.Ct. at 903. The district court's order, however, does not relate to enforcement of procedural protections. The work requirement relates only to the conditions of confinement. To the extent Part III(C) merely constitutes an enforcement of state law, it violates the eleventh amendment. *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 97–121, 104 S.Ct. 900, 906–19, 79 L.Ed.2d 67 (1984).

### B. Eighth Amendment

 In *Hoptowit v. Ray*, 682 F.2d at 1254–55, 1258, we held that "[i]dleness and the lack of programs are not eighth amendment violations. The lack of these programs simply does not amount to the infliction of pain." The district court recognized this language as controlling. 597 F.Supp. at 1414. Plaintiffs,[27] nonetheless, urge us to reverse the district court's decision that enforced idleness is not a violation of the eighth amendment. Plaintiffs implicitly urge us to overrule *Hoptowit v. Ray*.

To arrive at the desired result, plaintiffs believe that two logical steps must be tak-

---

**26.** We note that Part IV(D) of the Permanent Injunction appears to allow a segregated prisoner to obtain repeated review of his status. As we have discussed above, due process requires only reasonable periodic review. *See Clark v. Brewer*, 776 F.2d at 234. On remand, if the district court decides that review by the court or the Monitor is required, the court shall not require more frequent review than is *necessary* to protect plaintiffs' due process rights.

**27.** Plaintiffs failed to brief this issue in their opposition brief and opening brief on cross-appeal, but instead refer us to the briefs filed by amici, the Bar Association of San Francisco, the San Francisco Lawyers Committee on Urban Affairs, and the California Attorneys for Criminal Justice. Defendants object to consideration of this issue on the basis that an argument made on appeal by amici, but not by the parties, is not properly before the reviewing court. In each of the cases cited by defendants, the courts refused to consider issues not raised by the parties. *See United Parcel Service, Inc. v. Mitchell*, 451 U.S. 56, 60 n. 2, 101 S.Ct. 1559, 1562 n. 2, 67 L.Ed.2d 732 (1981); *Bell v. Wolfish*, 441 U.S. 520, 531 n. 13, 99 S.Ct. 1861, 1870 n. 13, 60 L.Ed.2d 447 (1979); *Knetsch v. United States*, 364 U.S. 361,

370, 81 S.Ct. 132, 137, 5 L.Ed.2d 128 (1970); *Wiggins Bros., Inc. v. Department of Energy*, 667 F.2d 77, 83 (Temp.Emer.Ct.App.1981), *cert. denied*, 456 U.S. 905, 102 S.Ct. 1749, 72 L.Ed.2d 161 (1982); *National Comm'n on Egg Nutrition v. Federal Trade Comm'n*, 570 F.2d 157, 160 n. 3 (7th Cir.1977), *cert. denied*, 439 U.S. 821, 99 S.Ct. 86, 58 L.Ed.2d 113 (1978). In the instant case, however, plaintiffs raised the issue but failed to brief it. Moreover, plaintiffs argue this issue in their reply brief on cross-appeal. The plaintiffs obtained leave of court to file their 75 page brief. The amici briefs add 39 pages of argument in support of plaintiffs' request on this issue. By incorporating amicis' arguments by reference, plaintiffs have circumvented the page limits set by the court.

Although we do not condone such practices generally, we recognize that this case presents a number of weighty constitutional issues. The defendants have had every opportunity to respond to the arguments of plaintiffs and amici and, in fact, have briefed this issue. Justice would not be served by ignoring the amicis' arguments. Therefore, we exercise our discretion to consider this issue.

To avoid confusion, henceforth we will refer to plaintiffs and amici solely as plaintiffs.

en. First, plaintiffs urge us to clarify the language in our prior opinions regarding the proper framework for analyzing an alleged eighth amendment violation. Second, plaintiffs urge us to reject or limit our holding in *Hoptowit v. Ray* regarding idleness.

In *Hoptowit v. Ray*, we considered the eighth amendment analytical framework at length. *See* 682 F.2d at 1246–47. Our discussion leads to the undeniable conclusion that we follow the "related conditions" approach urged by plaintiffs. Plaintiffs object, however, to one statement in *Hoptowit.* In *Hoptowit* we stated, inter alia, that "[a] number of conditions, each of which satisfy Eighth Amendment requirements, cannot in combination amount to an Eighth Amendment violation." 682 F.2d at 1247. To the extent that this sentence creates uncertainty or ambiguity regarding the analytical framework employed in this circuit, such uncertainty or ambiguity may be rectified easily. We meant that a number of *unrelated* conditions, each of which satisfy eighth amendment requirements, cannot in combination amount to an eighth amendment violation. *See Wright v. Rushen,* 642 F.2d at 1133.

Plaintiffs contend that *Hoptowit v. Ray* ignores related conditions by creating a per se rule that enforced idleness does not constitute cruel and unusual punishment. Plaintiffs argue that by applying *Hoptowit's* per se rule, the district court failed to consider related conditions that, when combined with enforced idleness, would create a cruel and inhuman situation.

Plaintiffs' arguments are unpersuasive for several reasons. First, related conditions are those conditions that combine to deprive a prisoner of a discrete basic human need. *Hoptowit v. Ray,* 682 F.2d at 1246. The discrete basic human needs that prison officials must satisfy include food, clothing, shelter, sanitation, medical care, and personal safety. *Id.; Wright v. Rushen,* 642 F.2d at 1132–33. Enforced idleness, taken alone, simply does not deprive a prisoner of any of these basic needs. *See Hoptowit v. Ray,* 682 F.2d at 1254–55.[28]

Second, plaintiffs do not identify any related conditions that would support a finding that enforced idleness created an eighth amendment violation in this case. Plaintiffs point to the violence and psychological pain that enforced idleness engenders. Related conditions, however, are not those that result from another condition, but those that in combination create a cruel and unusual punishment. *See, e.g., Wright v. Rushen,* 642 F.2d at 1134; *Spain v. Procunier,* 600 F.2d 189, 199 (9th Cir.1979). In reality, plaintiffs urge us to hold as a matter of law that "lengthy enforced idleness does not comport with contemporary standards of decency, and that work, educational, and vocational programs are constitutionally mandated." Plaintiffs, therefore, implicitly ask us to overrule *Hoptowit v. Ray* and create a per se rule to the contrary.

Third, even if we held that enforced idleness in administrative segregation constitutes cruel and unusual punishment, it does not follow that mandating work programs is the appropriate remedy. An injunction must be narrowly tailored to cure the constitutional violation and must not intrude

---

**28.** Although methods of analysis differ, each circuit that has considered the issue has held that enforced idleness does not constitute cruel and unusual punishment. *See Jackson v. Meachum,* 699 F.2d 578, 581–85 (1st Cir.1983) (cataloging decisions of other circuits); *see also Madyun v. Thompson,* 657 F.2d 868, 874 (7th Cir. 1981); *Ramos v. Lamm,* 639 F.2d 559, 566–67 (10th Cir.1980), *cert. denied* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *Bono v. Saxbe,* 620 F.2d 609, 614–15 (7th Cir.1980); *Newman v. Alabama,* 559 F.2d 283 (5th Cir. 1977), *rev'd in part on other grounds sub nom.*

*Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978); *Sweet v. South Carolina Department of Corrections,* 529 F.2d 854, 861 (4th Cir.1975); *Sostre v. Mcginnis,* 442 F.2d 178, 192–93 (2d Cir.1971), *cert. denied,* 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972). The expert opinions cited by plaintiffs are entitled to little weight in determining whether a particular condition constitutes cruel and unusual punishment. *Rhodes v. Chapman,* 452 U.S. 337, 348 n. 13, 101 S.Ct. 2392, 2400 n. 13, 69 L.Ed.2d 59 (1981). We adhere to our holding in *Hoptowit v. Ray.*

on the functions of state officials unnecessarily. We would violate this principle by holding as a matter of law that provision of work programs is the necessary remedy for enforced idleness. *See supra* note 4; *Grummett v. Rushen,* 779 F.2d at 496–97 (Sneed, J., concurring).

Fourth, whether or not *Hoptowit* states a per se rule, the district court did not apply it as such. Plaintiffs distort the district court's factual findings and legal reasoning to create the impression that the district court failed to consider the effect of enforced idleness on the plaintiffs. The district court, however, considered several factors in concluding that idleness did not rise to an eighth amendment violation. The court stated that—

the denial of programs to plaintiffs is not 'totally without penological justification.' At least in theory, each plaintiff has been selected for segregation on the basis of criteria indicating that he is in some way unfit or unsuited for intermingling with other inmates, whether because he has misbehaved, because he presents a threat to the safety of other inmates, or because he has requested isolation from other inmates for his own protection.

597 F.Supp. at 1414. The district court, therefore, did not blindly follow a *per se* approach.[29]

The plaintiffs' argument largely depends on the assertion that enforced idleness engenders a high degree of violence. Plaintiffs attempt to draw a close connection between enforced idleness and violence in the instant case by stating that "The District Court specifically found that '[l]ockup units at San Quentin and Folsom are counted among the most violence-racked correctional facilities in the United States.... In part, it may be due to the fact that lockup units have no programs.'" The district court's findings indicate that the connection between violence and en-

forced idleness in administrative segregation is substantially more attenuated than plaintiffs would have us believe. The district court stated in full:

Lockup units at San Quentin and Folsom are counted among the most violence-racked correctional facilities in the United States. In part, this is due to the California Department of Corrections policy of concentrating the most violence-prone offenders in these two institutions. In part, it is caused by the horrendous physical conditions, including double-celling. In part, it is due to the crowding of both facilities beyond design capacity. In part, it may be due to the fact that lockup units have no programs. But in large measure, it originates in the violent propensities of segregated inmates themselves.

597 F.Supp. at 1404–05.

The plaintiffs' argument also depends on the assertion that enforced idleness inflicts psychological pain without penological justification. Again, plaintiffs ignore the actual findings and reasoning of the district court. The district court expressly found that "denial of programs is not totally without penological justification." 597 F.Supp. at 1414. Plaintiffs' argument that the district court failed to consider related conditions, therefore, is incorrect.

We vacate Part III(C) of the Permanent Injunction. The administration of state-created work programs is the province of prison officials, not of the district court.

# IX

## ACCESS TO THE PRISON LAW LIBRARY

In Part II(15) of the Permanent Injunction, the district court ordered defendants to allow segregated prisoners access to the prison law library as reasonably necessary,

---

**29.** Regardless of the ambiguity in this circuit's description of the eighth amendment analytical framework, it is abundantly clear that the district court adopted and applied the related conditions approach throughout its opinion. *See, e.g.,* 597 F.Supp. at 1408 (if all other conditions are satisfactory, segregating inmates in small cells is not eighth amendment violation); *id.* at 1409 (under prevailing conditions, double cell-ing is cruel and inhuman); *id.* at 1411 (conditions of filth require that inmates be provided with hot running water or periodic showers).

absent documented security reasons. 597 F.Supp. at 1424. The court found that the "paging system"[30] in use at San Quentin and Folsom rendered effective legal research virtually impossible. *Id.* at 1403. However, the district court allowed the defendants to deny physical access to the libraries to those plaintiffs who are documented security risks. *Id.* at 1424. The court specified that any prisoner denied access to the libraries be permitted to order five books per week, which would be delivered to the prisoner's cell. *Id.*

In *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), the Supreme Court held that prisoners have a constitutional right of access to the courts which in turn requires prison authorities to provide prisoners with adequate law libraries or adequate assistance from persons trained in the law. *Id.* at 828, 97 S.Ct. at 1498; *see Lindquist v. Idaho State Board of Corrections,* 776 F.2d 851, 855 (9th Cir.1985). In *Lindquist,* we recognized that

> The existence of an adequate law library does not provide for meaningful access to the courts if the inmates are not allowed a reasonable amount of time to use the library. However, the Constitution does not guarantee a prisoner unlimited access to a law library. Prison officials of necessity must regulate the time, manner, and place in which library facilities are used. The fact that an inmate must wait for a turn to use the library does not necessarily mean that he has been denied meaningful access to the court.

*Id.* at 858 (citations omitted).

Defendants do not challenge the validity of the district court's factual findings. Defendants argue that the district court should have limited injunctive relief to remedying the deficiencies in the paging system. Plaintiffs argue that the district court did not abuse its discretion in order-

ing physical access absent compelling security needs. Plaintiffs also argue, however, that the district court abused its discretion by failing to require defendants to provide legal assistance to inmates barred from physical access.

The district court's order accommodates defendants' interests by allowing them to limit physical access to the law library. They need only permit reasonably necessary use. Moreover, even if a segregated inmate needs to use the law library, defendants may preclude physical access if such access would interfere with institutional security.

The defendants interpret the portion of the court's order allowing limited use of the paging system as an acknowledgement of the efficacy of the system. This interpretation is incorrect. The district court expressly found that the paging system significantly impairs effective legal research. 597 F.Supp. at 1403, 1413. Allowing a limited use of the paging system merely recognizes defendants' interest in institutional security.

Plaintiffs contend that even as "improved" by the district court, the paging system is constitutionally deficient. This argument has merit. In *Williams v. Leeke,* 584 F.2d 1336 (4th Cir.1978), *cert. denied,* 441 U.S. 911, 99 S.Ct. 2825, 61 L.Ed.2d 276 (1979), the Fourth Circuit held that allowing a prisoner physical access to a law library for 45 minutes a day, three days a week did not constitute a meaningful opportunity to conduct legal research. *Id.* at 1340. Presumably, a prisoner could examine more than five books in that amount of time. The *Williams* court noted that

> Ordinarily, a prisoner should have direct access to a law library if the state chooses to provide a prison law library as its way of satisfying the mandate of *Bounds.* Simply providing a prisoner with books in his cell, if he requests

---

**30.** A paging system allows a prisoner to request specific volumes. The significant features of such a system are that the prisoner must know in advance which volumes he will need to review and that the process of ordering and returning books drastically prolongs legal research.

them, gives the prisoner no meaningful change to explore the legal remedies that he might have. Legal research often requires browsing through various materials in search of inspiration; tentative theories may have to be abandoned in the course of research in the face of unfamiliar adverse precedent. New theories may occur as a result of a chance discovery of an obscure or forgotten case. Certainly a prisoner, unversed in the law and the methods of legal research, will need more time or more assistance than the trained lawyer exploring his case. It is unrealistic to expect a prisoner to know in advance exactly what materials he needs to consult.

*Id.* at 1339.

The *Williams* court permitted the state to use a paging system when the state did not rely solely on access to a law library to satisfy *Bounds*. In *Williams,* Virginia and South Carolina provided state-funded legal counsel or trained legal assistants to prisoners contesting the legality or conditions of confinement. *Id.*

Plaintiffs in the instant case request research assistance for all prisoners denied physical access to the law libraries. The great weight of authority in the courts of appeals supports plaintiffs' request. *See Nordgren v. Milliken,* 762 F.2d 851, 853–55 (10th Cir.1985) (state provided access to courts by providing legal assistance in drafting pleadings), *cert. denied,* —— U.S. ——, 106 S.Ct. 593, 88 L.Ed.2d 573 (1986); *Williams v. Wyrick,* 747 F.2d 1231, 1232 (8th Cir.1984) (state satisfied *Bounds* by providing two inmate paralegals and one runner to procure law books, copy materials and research legal questions for 23 death-row inmates); *Corgain v. Miller,* 708 F.2d 1241, 1247–50 (7th Cir.1983) (where state actually provided legal assistance, access to legal materials could be restricted); *Holt v. Pitts,* 702 F.2d 639, 640–41 (6th Cir.1983) (state may deny physical access to law library to ensure security when prisoner has access to person trained in law); *Rich v. Zitnay,* 644 F.2d 41, 43 (1st Cir. 1981) (state must show that alternatives to access to prison library satisfy *Bounds*);

*Williams v. Leeke,* 584 F.2d at 1339. *Cf. Arsberry v. Sielaff,* 586 F.2d 37, 44 (7th Cir.1978) ("as long as adequate alternatives are available in light of legitimate penological objectives, a limitation on a prisoner's constitutional rights will not be deemed impermissible"). Moreover, plaintiffs' suggested remedy would not be overly intrusive. The defendants would only be required to provide legal assistance to those prisoners that defendants deem to be a security risk.

 Therefore, we conclude that *all* prisoners are entitled to meaningful access to the courts. If the state denies a prisoner reasonable access to a law library, the state must provide that prisoner legal assistance. If the parties fail to agree on a plan that provides meaningful access to the courts, the district court shall fashion one that comports with the requirements established in this opinion.

## X

### ACOUSTICAL WALL COVERINGS

In Part II(6) of the Permanent Injunction, the district court ordered defendants to install, inter alia, sound-absorbing wallcoverings in the five-tier units. 597 F.Supp. at 1423. Defendants do not object to the district court's conclusion that the level of noise in the five tier units inflicts pain without penological justification. They contest the court's remedy. They argue that wall coverings would not reduce the noise perceptibly and would be costly.

 The fact that a remedy is costly does not preclude a district court from ordering the remedy. *Hoptowit,* 682 F.2d at 1247. The testimony of *defendants'* expert witness supports the conclusion that the remedy ordered by the court would reduce the noise levels perceptibly. The district court's choice of remedy was a proper exercise of discretion.

## XI

### ADJUSTABLE HOT AND COLD WATER CONTROLS

In Part II(10) of the Permanent Injunction, the district court ordered that the

shower facilities used by inmates in segregation be equipped with adjustable valves for hot and cold water. 597 F.Supp. at 1423. The court found showers necessary to protect the plaintiffs' interest in proper shelter, sanitation, and medical care. *Id.* at 1399–1400, 1411.

The defendants contend that the remedy was too intrusive. Defendants claim that the district court could have required defendants to provide warm water, rather than hot and cold water.

■■■ The court's order is not overly intrusive. The requirement that defendants install hot and cold water controls will necessitate the expenditure of public funds. Defendants, however, do not complain that the cost would be prohibitive. Nor do defendants complain that adjustable controls will interfere with prison security or other legitimate penological concerns. Most importantly, requiring defendants to install adjustable controls will not affect the daily operation of the prison. The adjustable controls will encourage showering and help reduce the adverse effects of confinement in a filthy environment.

We uphold Part II(10) of the Permanent Injunction.

## XII

### HEALTH CARE AT FOLSOM

The district court determined that the system of health care at Folsom does not manifest deliberate indifference to the serious medical needs of the prisoners. *See* 597 F.Supp. at 1414. Plaintiffs appeal this conclusion in respect to several aspects of Folsom's health care system. We will discuss each separately.

### A. Access to Medical and Psychiatric Care

The district court found that Folsom employs five physicians, two psychiatrists, and a psychologist to care for 3,500 prisoners. 597 F.Supp. at 1403–04. Medical technical assistants (MTAs) screen inmate complaints. *Id.* at 1404. MTAs conduct sick call in the lockup units on a daily basis.

*Id.* A physician passes by the cells once a week. *Id.* MTAs generally determine which inmates will be sent to the infirmary for medical treatment. *Id.* However, inmates will be allowed to consult a physician if they insist. *Id.* The court found "that while there may be isolated exceptions, Folsom provides most strictly 'necessary' treatment on a timely, medically sound basis." *Id.*

■■■ Denial of medical attention to prisoners constitutes an eighth amendment violation if the denial amounts to deliberate indifference to serious medical needs of the prisoners. *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). "Prison officials show deliberate indifference to serious medical needs if prisoners are unable to make their medical problems known to medical staff." *Hoptowit v. Ray,* 682 F.2d at 1253. The district court found that segregated inmates could be examined or treated by a doctor during the weekly visit or insist on an earlier appointment. Folsom, therefore, does not deliberately deny or delay a prisoner's access to medical care. *See Estelle v. Gamble,* 429 U.S. at 104–05, 97 S.Ct. at 291. Plaintiffs' citations to isolated occurrences of neglect do not amount to a constitutional violation. "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence *deliberate* indifference to serious medical needs." *Gamble,* 429 U.S. at 106, 97 S.Ct. at 292 (emphasis added).

### B. Use of Unqualified Medical Personnel

■■■ Plaintiffs argue that defendants place an unconstitutional degree of reliance on MTAs, registered nurses (RNs), and inmate workers. The district court found that the MTAs screen inmates and administer nonprescription drugs. 597 F.Supp. at 1404. Plaintiffs cite testimony indicating that MTAs, RNs, and inmates provide a number of services which they are not qualified to perform. Defendants respond that MTAs, RNs and inmates are qualified

to perform a number of services. If plaintiffs correctly contend that unqualified personnel regularly engage in medical practice, precedent indicates that the prison health care delivery system may reflect deliberate indifference to plaintiffs' medical needs. *See Hoptowit v. Ray*, 682 F.2d at 1252 (district court correctly found eighth amendment violation where, inter alia, medication was prepared and dispensed by unqualified personnel). Therefore, we must remand for entry of explicit factual findings regarding the nature of services performed by MTAs, RNs, and inmates, their level of medical qualification, and the level of qualification required to adequately render the services that they perform.

## C. Confidentiality of Records

■ Plaintiffs argue that constitutionally adequate medical care cannot be provided without complete medical records, and that medical records are inadequate if they lack confidentiality. Plaintiffs cite *Williams v. Edwards*, 547 F.2d 1206, 1216 (5th Cir.1977), for the proposition that medical records are inadequate if they lack confidentiality. In *Williams v. Edwards*, inmate medical assistants failed to keep any medical records of certain procedures. *Id.* Nothing in *Williams v. Edwards* indicates a causal connection between lack of confidentiality and inadequacy of records. We reject plaintiffs' argument.

## D. Lack of Special Medical Diets

■ The district court found that the only special diet available at Folsom is one designed for treating ulcers. 597 F.Supp. at 1404. Prisoners needing other special

diets must await transfer to another institution. *Id.* Plaintiffs argue that so long as prompt transfers are unavailable, failure to provide special diets is unconstitutional. We disagree. A fair reading of the district court's findings of fact indicates that if a prisoners needs a special diet, eventually he will be transferred to an institution that is equipped to provide it. Neither precedent nor common sense suggests that delay in providing a special diet arises to the level of deliberate indifference. The district court did not abuse its discretion by refusing to order defendants to provide special diets.

## E. Medical Facilities

■ The district court found that in comparison with other parts of the prison, the Folsom infirmary is relatively clean, but that sanitation failed to meet medical standards. 597 F.Supp. at 1404. Plaintiffs argue that inadequate and unsanitary health care facilities violate the eighth amendment.

Plaintiffs' authorities do not support such a broad proposition. In *Williams v. Edwards*, 547 F.2d at 1217, a "filthy" emergency room was but one factor in determining the existence of deliberate indifference. The filth included the storage of live fish in a whirlpool bath. *Id.* In *Newman v. Alabama*, 503 F.2d 1320, 1323 (5th Cir.1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975), the lack of sanitation included the cleaning of linens from patients with hepatitis and tuberculosis along with the linens of other infirmary inmates.[31] In *Lightfoot v. Walk-*

---

**31.** The lack of health care in the Alabama prisons, which were the subject of *Newman v. Alabama,* provides a stark contrast with the level of health care at Folsom:

> Immediately before [court] intervention, medical services for Alabama's almost 4,000 prisoners were provided largely at a state medical and diagnostic center. The center maintained no full-time physician; instead, care was provided by three private doctors working part-time at the center, three registered nurses, eight unlicensed former military medics, and a part-time dentist. Facilities at individual prisons were even worse.

> One unit housing 850 inmates, for example, had no full-time physician and a dentist available only one-half day of each week. Because of understaffing, unsupervised and untrained inmates regularly provided medical services, including minor surgery. The horror stories coming out of such a setting were numerous. Bedsores of a quadraplegic who spent many months at the medical and diagnostic center, for example, became infested with maggots. In the month before his death, he was bathed, and his bandages changed, only once.

Yarbrough, *The Alabama Prison Litigation,* 9 Just. Sys.J. 276, 277 (1984) (citations omitted).

*er,* 486 F.Supp. at 512, surgical instruments were not sterilized, the surgical suite was not cleaned routinely, and clean and soiled linens were stored together.

Unlike *Lightfoot* and *Williams,* surgery is not performed at the Folsom infirmary. 597 F.Supp. at 1404. Unlike *Williams,* the Folsom infirmary is not subject to vermin infestation. *Id.* Unlike *Newman,* there is no indication in this case that infirmary officials were so callous to the health needs of the inmates as to mix the laundry of patients with highly communicable infectious diseases with that of the general infirmary inmates. *Id.*

## F. Conclusions Regarding Health Care at Folsom

In sum, Folsom's health care conditions fall below medical standards. The fact that a given condition might constitute medical malpractice, however, does not necessarily mean that the condition constitutes cruel and unusual punishment. *Estelle v. Gamble,* 429 U.S. at 106, 97 S.Ct. at 292. It is only deliberate indifference to serious medical needs that can offend "evolving standards of decency" in violation of the eighth amendment. *Id.* However, the district court's failure to render specific factual findings regarding the level of reliance on unqualified personnel requires a remand for entry of such findings.

## XIII

## CONTACT VISITATION

The district court held that denial of contact visits to inmates in administrative segregation does not constitute cruel and unusual punishment. 597 F.Supp. at 1413.

Plaintiffs assert that the district court improperly applied a *per se* rule. They urge us to remand the case to the district court with instructions to reconsider whether all prisoners in administrative segregation in San Quentin and Folsom are entitled to individualized determinations on their suitability for contact visits.

█ Plaintiffs cite no authority for the proposition that denial of contact visits con-

stitutes cruel and unusual punishment. Instead, they argue that the evidence adduced at trial demonstrates that contact visitation would have beneficial rehabilitative effects. They contend that "there was unanimity of evidence that contact visits thus are vital to inmate health, as the deprivation of human contact involves extreme suffering and affects both physical and mental health."

█ Judicial authority uniformly contradicts plaintiffs' assertions. *See Ramos v. Lamm,* 639 F.2d 559, 580 n. 26 (10th Cir.1980) ("weight of present authority clearly establishes that there is no constitutional right to contact visitation ... We agree with this view."), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *Lynott v. Henderson,* 610 F.2d 340, 342 (5th Cir.1980) ("convicted prisoners have no absolute constitutional right to visitation"); *Feeley v. Sampson,* 570 F.2d 364, 372–73 (1st Cir.1978) ("we can discover no constitutional guarantee that [contact visits] may take place."); *Oxendine v. Williams,* 509 F.2d 1405, 1407 (4th Cir.1975) ("[prisoner] has no constitutional right to physical contact with his family."); *see also Smith v. Coughlin,* 748 F.2d 783, 788 (2d Cir.1984) (contact visits with persons other than priest, lawyer, and doctor could disrupt prison administration, create security risks, and allow smuggling of contraband; denial of contact visits did not violate prisoners' first amendment rights); *O'Bryan v. County of Saginan,* 741 F.2d 283, 284–85 (6th Cir.1984) (denial of contact visits for pretrial detainees did not violate constitution); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 758–60 (3d Cir. 1979) (ban on contact visits does not violate due process rights of prisoners). Expert opinion is entitled to little weight in determining whether a punishment is cruel and unusual. *See Rhodes v. Chapman,* 452 U.S. at 348 n. 13, 101 S.Ct. at 2400 n. 13. Plaintiffs' argument, therefore, lacks support. Denial of contact visitation simply does not amount to the infliction of pain. *Cf. Hoptowit v. Ray,* 682 F.2d at 1254–55.

Even if denial of contact visitation amounted to an infliction of pain, the eighth amendment would not prohibit the denial unless the pain were inflicted wantonly and without penological justification. *Rhodes v. Chapman,* 452 U.S. at 346, 101 S.Ct. at 2399. The district court found that no segregated inmate was deprived of all visits and most were allowed contact visits. 597 F.Supp. at 1413. The court found that despite thorough searches, contact visits result in the smuggling of contraband, particularly drugs. *Id.* at 1403. The court commended defendants for their efforts to improve visiting facilities at Folsom. *Id.* at 1413 n. 44. The court noted that San Quentin was one of the very few maximum security prisons in the nation to allow conjugal visitation for any of its inmates. *Id.* at 1402 n. 25. The court's findings hardly indicate that defendants wantonly inflict pain on the plaintiffs. To the contrary, the district court's findings indicate that denial of contact visitation is based on sound penological justifications.[32]

To the extent that denial of contact visitation is restrictive and even harsh, it is part of the penalty that criminals pay for their offenses against society. *Cf. Rhodes v. Chapman,* 452 U.S. at 347, 101 S.Ct. at 2399.

## XIV

### CONCLUSION

For the reasons stated above, we direct as follows:

1. We reverse the district court's conclusion that Cal. Penal Code §§ 2931, 2933 create a liberty interest triggering due process protections. The *Wright I* order is vacated. Parts III and IV(D) of the Permanent Injunction are vacated. All release orders are vacated. We hold, however, that 15 Cal. Admin. Code § 3339(a) creates a liberty interest. On remand, the district court shall determine whether the defendants' segregation procedures meet the due process requirements as stated above. If the district court determines that defendants' procedures do not meet the requirements stated above, and that the defendants are unlikely to comply voluntarily, the district court shall order such relief as it deems *necessary* to obtain compliance.

2. The district court's conclusions and order regarding noise reduction (Part II(6)) and adjustable controls for hot and cold running water (Part II(10)) are affirmed.

3. The district court's conclusions and order regarding access to the prison law library (Part II(15)) are affirmed to the extent that the court required defendants to permit segregated prisoners access to the law library. The district court's conclusions are reversed and its order vacated to the extent that the court allowed defendants to rely on a paging system for those prisoners who are denied access because of security reasons. On remand, the district court shall determine how best to accommodate plaintiffs' right to meaningful access to the courts and defendants' interest in institutional security and economy.

4. The district court's conclusions that denial of work programs and contact visitation does not constitute cruel and unusual punishment are affirmed.

5. The district court's conclusion that the health care system at Folsom does not constitute cruel and unusual punishment is affirmed. However, on remand the district court, if necessary, shall render explicit factual findings regarding the qualifications of personnel rendering medical services in order to allow further appellate review.

6. Each party shall bear its own costs.

---

**32.** Plaintiffs fault the district court for relying on *Block v. Rutherford,* 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984). In *Block,* the Supreme Court held that denial of contact visits to pretrial detainees did not violate due process. *Id.* at 589, 104 S.Ct. at 3233. As plaintiffs assert, *Block* is distinguishable on the basis that the pretrial detainees in *Block* were subject to denial of contact visitation only for a limited period of time. *Cf. Hutto v. Finney,* 437 U.S. at 686–87, 98 S.Ct. at 2571 (conditions tolerable for a short period of time are intolerable for a long period of time). The fact that *Block* is distinguishable, however, does not improve plaintiffs' position.

AFFIRMED in part, REVERSED in part, VACATED in part, and REMANDED.

## APPENDIX

**Cal. Penal Code § 2931.** Reduction of term for good behavior and participation; conditions

(a) In any case in which a prisoner was sentenced to the state prison pursuant to Section 1170, or if he committed a felony before July 1, 1977, and he would have been sentenced under Section 1170 if the felony had been committed after July 1, 1977, the Department of Corrections shall have the authority to reduce the term prescribed under such section by one-third for good behavior and participation consistent with subdivision (d) of Section 1170.2. A document shall be signed by a prison official and given to the prisoner, at the time of compliance with Section 2930, outlining the conditions which the prisoner shall meet to receive the credit. The conditions specified in such document may be modified upon any of the following:

(1) Mutual consent of the prisoner and the Department of Corrections.

(2) The transfer of the prisoner from one institution to another.

(3) The department's determination of the prisoner's lack of adaptability or success in a specific program or assignment. In such case the prisoner shall be entitled to a hearing regarding the department's decision.

(4) A change in custodial status.

(b) Total possible good behavior and participation credit shall result in a four-month reduction for each eight months served in prison or in a reduction based on this ratio for any lesser period of time. Three months of this four-month reduction, or a reduction based on this ratio for any lesser period, shall be based upon forebearance from any act for which the prisoner could be prosecuted in a court of law, either as a misdemeanor or a felony, or any act of misconduct described as a serious disciplinary infraction by the Department of Corrections.

(c) One month of this four-month reduction, or a reduction based on this ratio for a lesser period, shall be based solely upon participation in work, educational, vocational, therapeutic or other prison activities. Failure to succeed after demonstrating a reasonable effort in the specified activity shall not result in loss of participation credit. Failure to participate in the specified activities can result in a maximum loss of credit of 30 days for each failure to participate. However, those confined for other than behavior problems shall be given specified activities commensurate with the custodial status.

(d) This section shall not apply to any person whose crime was committed on or after January 1, 1983.

**Cal. Penal Code § 2932.** Denial of time credits; grounds; limitations; procedure; effect; review; criminal prosecution

(a) For any time credit accumulated pursuant to Section 2931 or to Section 2933, not more than 180 days of credit may be denied or lost for a single act of misconduct which could be prosecuted as a felony whether or not prosecution is undertaken, except that not more than one year of credit may be denied or lost for a single act of battery in which great bodily injury is inflicted upon a nonprisoner. Not more than 90 days of credit may be denied or lost for a single act of misconduct which could be prosecuted as a misdemeanor, whether or not prosecution is undertaken. Not more than 30 days of credit may be denied or lost for a single act of misconduct defined by regulation as a serious disciplinary offense by the Department of Corrections. Any person confined due to a change in custodial classification following the commission of any serious disciplinary infraction shall, in addition to any loss of time credits, be ineligible to receive participation or worktime credit for a period not to exceed the number of days of credit which have been lost for such act of misconduct. In unusual cases, an inmate may be denied the opportunity to participate in a credit qualifying assignment for up to six months beyond the period specified in this subdivision if the Di-

rector of Corrections finds, after a hearing, that no credit qualifying program may be assigned to the inmate without creating a substantial risk of physical harm to staff or other inmates. At the end of the six-month period and of successive six-month periods, the denial of the opportunity to participate in a credit qualifying assignment may be renewed upon a hearing and finding by the director.

The prisoner may appeal the decision through the department's review procedure, which shall include a review by an individual independent of the institution who has supervisorial authority over the situation.

(b) For any credit accumulated pursuant to Section 2931, not more than 30 days of participation credit may be denied or lost for a single failure or refusal to participate. Any act of misconduct described by the Department of Corrections as a serious disciplinary infraction if committed while participating in work, educational, vocational, therapeutic or other prison activity shall be deemed a failure to participate.

(c) Any procedure not provided for by this section, but necessary to carry out the purposes of this section, shall be those procedures provided for by the Department of Corrections for serious disciplinary infractions if those procedures are not in conflict with this section.

(1) The Department of Corrections shall, using reasonable diligence to investigate, provide written notice to the prisoner. The written notice shall be given within 15 days after the discovery of information leading to charges that may result in a possible denial of credit, except that if the prisoner has escaped, the notice shall be given within 15 days of the prisoner's return to the custody of the Director of Corrections. The written notice shall include the specific charge, the date, the time, the place that the alleged misbehavior took place, the evidence relied upon, a written explanation of the procedures that will be employed at the proceedings and the prisoner's rights at the hearing. The hearing shall be conducted by an individual who shall be independent of the case and shall take place within 30 days of the written notice.

(2) The prisoner may elect to be assigned an employee to assist in the investigation, preparation, or presentation of a defense at the disciplinary hearing if it is determined by the department that: (i) the prisoner is illiterate; or (ii) the complexity of the issues or the prisoner's confinement status makes it unlikely that the prisoner can collect and present the evidence necessary for an adequate comprehension of the case.

(3) The prisoner may request witnesses to attend the hearing and they shall be called unless the person conducting the hearing has specific reasons to deny this request. Such specific reasons shall be set forth in writing and a copy of the document shall be presented to the prisoner.

(4) The prisoner has the right, under the direction of the person conducting the hearing, to question all witnesses.

(5) At the conclusion of the hearing the charge shall be dismissed if the facts do not support the charge, or the prisoner may be found guilty on the basis of a preponderance of the evidence.

(d) If found guilty the prisoner shall be advised in writing of the guilty finding and the specific evidence relied upon to reach this conclusion and the amount of time-credit loss. The prisoner may appeal such decision through the Department of Corrections' review procedure, and may, upon final notification of appeal denial, within 15 days of such notification demand review of the department's denial of credit to the Board of Prison Terms, and the board may affirm, reverse, or modify the department's decision or grant a hearing before the board at which hearing the prisoner will have the rights specified in Section 3041.5.

(e) Each prisoner subject to Section 2931 shall be notified of the total amount of good behavior and participation credit which may be credited pursuant to Section 2931, and his anticipated time-credit release date. The prisoner shall be notified of any change in the anticipated release date due to denial or loss of credits, award of work-

time credit, under Section 2933, or the restoration of any credits previously forfeited.

(f) If the conduct the prisoner is charged with also constitutes a crime, the Department of Corrections may refer the case to criminal authorities for possible prosecution. The department shall notify the prisoner, who may request postponement of the disciplinary proceedings pending such referral.

The prisoner may revoke his request for postponement of the disciplinary proceedings up until the filing of the accusatory pleading. In the event of the revocation of the request for postponement of the proceeding, the department shall hold the hearing within 30 days of the revocation.

In the case where the prisoner is prosecuted by the district attorney, the Department of Corrections shall not deny time credit where the prisoner is found not guilty and may deny credit if the prisoner is found guilty, in which case the procedures in subdivision (c) shall not apply.

(g) If time credit denial proceedings or criminal prosecution prohibit the release of a prisoner who would have otherwise been released, and the prisoner is found not guilty of the alleged misconduct, the amount of time spent incarcerated, in excess of what the period of incarceration would have been absent the alleged misbehavior, shall be deducted from the prisoner's parole period.

(h) Nothing in the amendments to this section made at the 1981–82 Regular Session of the Legislature shall affect the granting or revocation of credits attributable to that portion of the prisoner's sentence served prior to January 1, 1983.

**Cal. Penal Code § 2933.** Worktime credits on sentences; amount; receipt; forfeiture; restoration; review

(a) It is the intent of the Legislature that persons convicted of crime and sentenced to state prison, under Section 1170, serve the entire sentence imposed by the court, except for a reduction in the time served in the custody of the Director of Corrections for performance in work, training or education programs established by the Director of Corrections. Worktime credits shall apply for performance in work assignments and performance in elementary, high school, or vocational education programs. Enrollment in a two- or four-year college program leading to a degree shall result in the application of time credits equal to that provided in Section 2931. For every six months of full-time performance in a credit qualifying program, as designated by the director, a prisoner shall be awarded worktime credit reductions from his term of confinement of six months. A lesser amount of credit based on this ratio shall be awarded for any lesser period of continuous performance. Less than maximum credit shall be awarded pursuant to regulations adopted by the director for prisoners not assigned to a full-time credit qualifying program. Every prisoner who refuses to accept a full-time credit qualifying assignment or who is denied the opportunity to earn worktime credits pursuant to subdivision (a) of Section 2932 shall be awarded no worktime credit reduction. Every prisoner who voluntarily accepts a half-time credit qualifying assignment in lieu of a full-time assignment shall be awarded worktime credit reductions from his term of confinement of three months for each six-month period of continued performance. Except as provided in subdivision (a) of Section 2932, every prisoner willing to participate in a full-time credit qualifying assignment but who is either not assigned to a full-time assignment or is assigned to a program for less than full time, shall receive no less credit than is provided under Section 2931. Under no circumstances shall any prisoner receive more than six months' credit reduction for any six-month period under this section.

(b) Worktime credit is a privilege, not a right. Worktime credit must be earned and may be forfeited pursuant to the provisions of Section 2932. Except as provided in subdivision (a) of Section 2932, every prisoner shall have a reasonable opportunity to participate in a full-time credit qualifying assignment in a manner consistent

with institutional security and available resources.

(c) Under regulations adopted by the Department of Corrections, which shall require a period of not more than one year free of disciplinary infractions, worktime credit which has been previously forfeited may be restored by the director. The regulations shall provide for separate classifications of serious disciplinary infractions as they relate to restoration of credits; the time period required before forefeited credits or a portion thereof may be restored; and the percentage of forfeited credits that may be restored for such time periods. No credits may be restored if they were forfeited for a serious disciplinary infraction in which the victim died or was permanently disabled. Upon application of the prisoner and following completion of the required time period free of disciplinary offenses, forfeited credits eligible for restoration under the regulations shall be restored unless, at a hearing, it is found that the prisoner refused to accept or failed to perform in a credit qualifying assignment or extraordinary circumstances are present that require that credits not be restored. "Extraordinary circumstances" shall be defined in the regulations adopted by the director.

The prisoner may appeal the finding through the Department of Corrections review procedure, which shall include a review by an individual independent of the institution who has supervisorial authority over the institution.

(d) The provisions of subdivision (c) shall also apply in cases of credit forfeited under Section 2931 for offenses and serious disciplinary infractions occurring on or after January 1, 1983.

### 15 Cal. Admin. Code § 3335. Administrative Segregation.

(a) When an inmate's presence within an institution's general inmate population presents an immediate threat to the inmate's own safety, the safety of others, endangers institution security or jeopardizes the integrity of an investigation into alleged serious misconduct or criminal activities, the inmate will be immediately removed from general population and be placed in administrative segregation. Administrative segregation may be accomplished by confinement in a unit designated for that particular purpose or, in an emergency, to any single cell unit capable of providing segregation from the general population and the degree of security and control required of the reason for such placement.

(b) An inmate's removal from general population and placement in a segregated unit for any reason except as provided in Section 3340 will be considered as administrative segregation until such time as a disciplinary or classification hearing has been held on the reasons or need for separation from the general population and other housing is designated.

### 15 Cal. Admin. Code § 3336. Segregation Order.

Authority to order an inmate to be placed in administrative segregation, before such action is considered and ordered by a classification hearing, may not be delegated below the staff level of correctional lieutenant or correctional program supervisor III, except when a lower level staff member is the highest ranking official on duty.

(a) The reason for ordering an inmate's placement in administrative segregation will be clearly documented on a CDC Form 114–D (Order and Hearing on Segregated Housing) by the official ordering the action at the time the action is taken.

(b) In addition to explaining the reason and need for an inmate's placement in administrative segregation, the official ordering the action will determine if a staff member needs to be assigned to assist the inmate in presenting the inmate's position at a classification hearing on the need for retention in segregated housing. Staff assistance will be assigned and the assignment will be noted on the CDC Form 114–D if the inmate is illiterate or if the complexities of the issues make it unlikely that the inmate can collect and present evidence necessary for an adequate comprehension

of the inmate's position at a classification hearing. If an inmate is not illiterate and the issues are not complex, staff assistance will not be assigned. The reason for not assigning staff assistance will be entered on the CDC Form 114–D.

(c) In assigning staff assistance, the official initiating the CDC Form 114–D will designate the inmate's caseworker by name, as the staff member to assist the inmate. If the assigned caseworker's name is not known or cannot be readily determined by the official initiating the CDC Form 114–D, the words "assigned caseworker" will be entered on the form.

(d) A copy of the CDC Form 114–D with the "order" portion of the form completed, will if practical, be given to the inmate prior to placement in administrative segregation but not later than 48 hours after such placement. Copies of the CDC Form 114–D with the "order" portion completed will also be submitted to the warden or superintendent or designated staff for review and possible further action as described in section 3337. A copy of the CDC Form 114–D will also be routed to the records office as a notice of the inmate's current status and pending actions.

**15 Cal. Admin. Code § 3339. Release From Administrative Segregation and Retention in Administrative Segregation.**

(a) Release: Release from segregation status shall occur at the earliest possible time in keeping with the circumstances and reasons for the inmate's initial placement in administrative segregation. Nothing in this article shall prevent the official ordering an inmate's placement in administrative segregation, or a staff member of higher rank in the same chain of command, from withdrawing an administrative segregation order before it is acted upon or prior to a hearing on the order after consulting with and obtaining the concurrence of the administrator of the general population unit to which the inmate will be returned or assigned. Release from segregated housing after such placement shall be effected only upon the written order of an equal or higher authority.